Nicholas Kappatos, Plaintiff-Appellee, v. Gray Company, Inc., a Corporation, Defendant-Appellant.

Gen. No. 52,601.

First District.

May 15, 1970.

Rehearing denied June 24, 1970.

Querrey, Harrow, Gulanick & Kennedy, of Chicago (John T. Kennedy, of counsel), for appellant.

Michael H. Postilion, of Chicago (Peter Ritsos and Ritsos & Ritsos, of counsel), for appellee.

TRAPP, J.

The defendant, Gray Company, Inc., appeals from a judgment in the sum of $45,000 entered upon a jury verdict in favor of plaintiff.

Plaintiff's injury resulted from paint emitted from a minute hole in a plastic spray painting hose being forced into his left thumb, with the consequent loss of the thumb to a point above his wrist. Defendant manufactured the hose.

Defendant contends that since the injury resulted from a hose which was alleged to be defective, it was incumbent upon plaintiff to establish that the hose was in the same condition at the time of the accident as it was when it was supplied by defendant, and that the record is devoid of such proof. Defendant also complains of errors in the trial in allowing amendment of pleadings, admission of evidence and instructions.

The hose in question was a plastic hose covered with wire braid. All plastic hose used by plaintiff's employer was obtained from Gray Company, Inc., it appearing that the earliest purchase was about two and one-half years prior to the accident, and the latest purchase thirteen months before the accident. The Alt Company, plaintiff's employer, stored its hose in a room usually at a 65° temperature in coils tied by a rope, or in boxes. In the course of spray painting, a certain amount of paint will accumulate on the hose. However, it was the custom of plaintiff's employer to clean the hose with caustic, and after such cleaning it would be clean and shiny to the extent that it was not readily distinguishable from new hose. The superintendent, who examined this hose after the accident, was able to say only that it was shiny and not whether it was new or newly cleaned. He testified that the company always tested reused hose before putting it on a job, but did not always test new hose if it was ordered out on the job. From the dates of purchase it would appear that the particular hose had been stored and was not newly ordered for this job. The hose was in lengths of about 25 feet, and in this case several sections were coupled to obtain 75 feet of hose. The hose delivered paint from a drum and compressor to a scaffold elevated some 25 feet for the purpose of painting ceiling girders. In this case the paint and air go through the same hose from the paint drum. They are not mixed at the gun.

The superintendent of plaintiff's employer testified that he examined the hose after the accident and could find absolutely no sign of damage to the outside of the hose, that there was no kink or dent or cut or hole in it. He had seen paint spurt from the body of the hose just after the accident and prior to the time he shut off the compressor. It was a very thin stream. He could not find the pinhole from which the paint was emitted when he examined the hose. The hose was disposed of some time after the accident, and has not been available for examination since the superintendent examined it.

The testimony of the plaintiff and the superintendent of plaintiff's employer as to the manner of occurrence of the accident differs widely. Plaintiff states that he put the paint gun on the end of the hose and took it up a ladder to the scaffold and got ready to paint. He is right-handed. He held the spray gun in his right hand and the hose in his left hand at a point three or four feet from the gun. The practice of holding the hose with the left hand is to give better control. The superintendent told him when he was ready to spray. He spray painted for about 15 minutes with no incident, when all of a sudden something hit him in the left thumb. The paint passed through his glove and hit the thumb. He left the gun on the scaffold and took 5 to 7 minutes to descend. A nurse gave him two shots for pain because his whole left arm was sore. He was taken to Michael Reese Hospital where he underwent four operations. He never used the gun after the first pain when the paint hit his thumb.

The superintendent states that he connected the hoses, saw plaintiff go up the scaffold and start to spray. The superintendent turned and walked away to set up other compressors. He had gone about 15 steps when he heard plaintiff yell, "It leak," "It leak." The thin stream of paint was coming from a point about 10 feet from the gun. He testified plaintiff went over and put his hand over the leak to keep the paint from spraying on the light

fixture, and moved 4 or 5 feet to do so. The superintendent said he removed the end length, put in a different section, charged it and sent plaintiff back to work again. He said plaintiff worked for half an hour, and then called out and said his hand stung. Plaintiff denies that he ever went back up to work again, and denies that he put his hand over the leak.

Dr. Richard M. Bendix treated plaintiff in Michael Reese Hospital. He described the injury as very unusual. "The thumb, at the time I saw it, was bluish and black, bluish streaked and black streaked at least, one could see in the thumb paint within the thumb itself. It was swollen, extremely painful, as painful an injury as I have been acquainted with in my practice." He incised the thumb laterally, and attempted to force the paint out under pressure. The thumb was full of black paint. He could not drain it all out. There was destruction of some of the soft tissues of the thumb. The paint had entered such a fine hole that he could not determine the point of entry of the thumb. Parts of the hand and wrist became infected, and an attempt was made to drain them. The thumb became gangrenous. In his opinion, the tremendous pressure shut off the blood supply to the thumb. In a third operation, the thumb was amputated just above where it joins the wrist. In a fourth operation, a skin graft from the thigh was placed over the open area of amputation. It is not possible to graft from the palm of the hand or the sole of the foot. The skin that was grafted cannot stand the normal pressure of everyday living and working. It cracks and peels. The lack of feeling on the outside of the index finger is probably due to an injury to the radial nerve which cannot be corrected.

Robert V. Peterson was called as an expert witness by plaintiff. He received a B.S. degree in chemical engineering in 1936 from Armour Institute of Technology now Illinois Institute of Technology, was a chemical engineer in safety for Liberty Mutual Ins. Co., from 1937

to 1942, spent 3 years as physicist and electrical engineer duty officer in the Navy, and as safety officer for the Ninth Naval District. Subsequently, he was in the Navy Bureau of Ordnance in control of accidents in the preparation and distribution of explosives. Since July, 1946, and for 19 years, he taught at Illinois Institute of Technology in industrial safety, traffic safety and special hazards. He is a member of the American Society of Safety Engineers. He has been consulted on causes of many industrial accidents.

Mr. Peterson, in answer to a hypothetical question, gave his opinion that the accident was caused by an inherent failure inside the hose caused by a defect in manufacturing. He substantiated this opinion by saying that if there was a kink or break or rupture, the minute the operator pushed the release there would have been a spouting out or big rupture. He stated that if there had been mechanical damage, such as being run over by a truck or by bending it, there would be a break in the armor part of the hose. His opinion was based chiefly upon the statement that there was no evidence of mechanical damage. He was of the opinion that there could not be damage to the inside of the hose caused by exterior force which would not show up in the damage to the armor cable. On being asked whether there were other causes than manufacturing defects that would give this fine point spray in this type of hose, he stated that he did not know of any in a plastic hose. He felt that mechanical damage to the hose would appear on the surface.

■ We think that under the principles set forth in Suvada v. White Motor Co., 32 Ill2d 612, 210 NE2d 183 at 188, and Dunham v. Vaughan & Bushnell Mfg. Co., 42 Ill2d 339, 247 NE2d 401 at 403, there was evidence from from which the jury could find that the plastic hose was in a defective condition which rendered it unreasonably dangerous at the time it left the control of the supplier.

Defendant objects that the complaint was based upon specific charges of negligence, and plaintiff was permitted to rely upon the doctrine of res ipsa loquitur. Count I of the complaint charges in general terms negligent and improper manufacture, and manufacture with material insufficient to withstand normal operating pressure. No instructions were given setting forth the doctrine of res ipsa loquitur. The complaint also charges negligent failure to warn that the hose was likely to develop a pinhole leak.

Count II is based upon the theory of strict liability for harm caused by a product which was defective to the extent that it was unreasonably dangerous to a user who used it in a manner in which it was intended to be used. Complaint is made that plaintiff was allowed to amend at trial to add Count II. Since the charge of defective product was made in the original complaint, no element of unreasonable surprise is involved.

■ ■ Defendant contends that the trial court improperly refused defendant's tendered instruction that plaintiff could not recover if plaintiff's lack of care was the proximate cause of the accident. The jury was, in fact, instructed that lack of care was a defense to Count I but was not a defense to Count II. Under the decision of the Supreme Court of Illinois in Williams v. Brown Mfg. Co., — Ill2d —, — NE2d —, contributory negligence as known in this state is not a bar to recovery in a strict product liability tort action in Illinois, and plaintiff need not plead and prove his exercise of care. While it is true that there is a sharp conflict, there is ample evidence from which the jury could conclude that the injury arose from a sudden failure of the hose while plaintiff was using it in the manner intended.

Defendant complains that the expert Dr. Peterson's name was not supplied to defendant in answer to interrogatories. The trial court apparently accepted the explanation that Dr. Peterson had not been consulted at the

time the inquiry was made. Defendant's counsel refused the opportunity to explore Dr. Peterson's testimony to determine whether the testimony would present any element of surprise which would hamper the defense.

 Defendant contends that the verdict of $45,000 is excessive. Plaintiff was a 36-year-old laborer at the time of the accident. Dr. Richard Bendix testified that the amputation of the thumb above the wrist joint, together with the skin graft which was susceptible to breaking and cracking and the loss of sensation along the index finger would interfere with normal living and working. Plaintiff will not be able to handle ladders and tools in a normal way. There was some evidence tending to establish a loss of income of $2,000 per year. The doctor expressed an opinion that the injured hand would give pain from time to time, and that there was no way of further alleviating it because the pain comes from the nerve ends in the stump. We are unable to say that the verdict was so large as to exhibit passion and prejudice on the part of the jury.

The judgment of the Circuit Court is affirmed.

Affirmed.

CRAVEN, P. J. and SMITH, J., concur.