JOHN PINELLI *et al.*, Plaintiffs and Counterdefendants-Appellees, *v.* ALPINE DEVELOPMENT CORP. *et al.*, Defendants and Counterplaintiffs-Appellants.— (WILLIAM ALLEN, Intervening Defendant and Counterplaintiff-Appellant.)

First District (5th Division)   Nos. 77-186, 61062 cons.

Opinion filed March 30, 1979.

982

McDermott, Will & Emery, of Chicago (James E. Betke, of counsel), for appellants.

Fein & Hanfling, of Chicago (Seymour J. Kurtz and Norman Hanfling, of counsel), for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

This is an appeal from an order of the trial court rescinding a contract for the sale of stock in the defendant, Alpine Development Corporation. The issues raised in this appeal arise out of the original trial between the parties and a remanded proceeding necessitated by an order of this court in an earlier appeal. We affirm on all issues raised.

Since some of the pleadings and procedural history in this case are of utmost importance for an understanding of the present appeal, we will set them out in some detail along with the relevant evidence presented at trial.

EARLY PLEADINGS

On July 30, 1970, plaintiffs, John and Henry Pinelli, filed a complaint for a resulting trust against defendants, Alpine Development Corporation (hereinafter, Alpine Development), First National Bank of Park Ridge (hereinafter, First National Bank), and O'Hare International Bank.[1] The complaint alleged that plaintiffs had transferred title to certain property located on Dempster Avenue (hereinafter, Dempster property) to the First National Bank to be held by it as trustee under Trust Agreement No. 62 and for the sole benefit of Alpine Development. Plaintiffs claimed that said transfer was without consideration and was intended to be without consideration because the Dempster property was only transferred for appearance sake so that Alpine Development and plaintiffs could obtain financing to construct an apartment building on the property. It was alleged that "[i]t was understood and agreed by and between the plaintiffs and Alpine [Development] that Alpine [Development] should hold the beneficial interest in Trust No. 62 with The First National Bank * * * in trust for the benefit and use of the plaintiffs." An apartment building was built on the Dempster property but plaintiffs alleged that they did not receive their share of the profits. As a result, and in fear that Alpine Development would sell the Dempster property to an innocent purchaser, plaintiffs requested both an accounting and a return to them of the Dempster property. Additionally, they asked "[f]or such other and further relief in the premises as justice and equity may require."

Defendants' answer denied that plaintiffs had a claim for a resulting

---

[1] The First National Bank changed its name to the O'Hare International Bank at a time relevant for this litigation.

trust. Their answer included several affirmative defenses stating that plaintiffs had received consideration for their property and that plaintiffs had sold their interest in the property upon sale of their stock in Alpine Development. Defendants alleged that plaintiffs had agreed with William S. Allen to undertake construction on their Dempster property. Under the express understanding of the agreement plaintiffs had agreed to contribute their property to such a venture and Allen agreed to furnish financial backing. Plaintiffs and Allen eventually agreed to incorporate and all of them received one-third of the corporate stock. Additionally, Allen contributed certain property that he owned in Park Ridge (hereinafter, Park Ridge property) as collateral for a $10,000 loan to Alpine Development for preliminary expenses. On February 14, 1966, plaintiffs sold their stock in Alpine Development to Allen. Defendants alleged that plaintiffs did not have a right to the return of the Dempster property or an accounting because when plaintiffs sold their stock in Alpine Development, they also sold their share in the corporate assets, which included the Dempster property.

Subsequent to the filing of defendants' answer, Allen, as sole shareholder of Alpine Development, sought and was granted leave to intervene as a defendant. He filed an answer alleging essentially the same facts as were alleged in First National Bank and Alpine Development's answer. He further claimed in a counterclaim that plaintiffs had failed to perform certain conditions of the sale of stock agreement.

A few weeks later, Alpine Development and First National Bank filed a counterclaim alleging that plaintiffs had failed to perform the conditions of the sale of stock agreement. Specifically, they stated that plaintiffs had failed to comply with the term of the agreement which required plaintiffs to pay certain excess costs for the construction of the apartment building on the Dempster property.

On November 18, 1971, plaintiffs filed an amended complaint for a resulting trust. Their amended complaint differed from the original complaint in that it alleged that Alpine Development did not exist at the time they made the transfer of the Dempster property. They further alleged that they did not know that Alpine Development did not exist and that they were fraudulently led to believe by Allen that Alpine Development did exist.

On July 7, 1972, plaintiffs filed a second amended complaint for a resulting trust. The second amended complaint differed from the amended complaint in that it alleged that Alpine Corporation, *not* Alpine Development, was the beneficiary of Trust Agreement No. 62 and that Alpine Corporation, *not* Alpine Development, constructed the building on the Dempster property, managed it and collected rents. It also alleged that Alpine Corporation was unrelated to Alpine Development. The

complaint specifically requested that the court declare that a resulting trust existed under which the O'Hare International Bank held title to the Dempster property in trust for the benefit of plaintiffs.

On October 11, 1972, Alpine Development and the First National Bank amended their counterclaim to include added construction costs which became due after the filing of their original counterclaim.

## PROOF

The relevant proof in this case consisted of the testimony of several witnesses, the deposition of Henry Pinelli, who was ill and thus unable to testify at trial, and many exhibits.

William S. Allen, intervenor-defendant, testified both as a section 60 witness and a witness for the defense. Allen was a college-trained individual who was employed as a division advertising manager for Union Carbide prior to his retirement. He stated that in late 1963 or early 1964 he began a series of discussions with plaintiffs on the idea of their getting together and developing certain property on Dempster Avenue which plaintiffs owned and certain property in Park Ridge which Allen owned. In their discussions, he mentioned drawing up a pre-incorporation agreement. They discussed setting up a Delaware corporation in which Allen would get 50% of the voting stock and one-third of the dividend stock; the plaintiffs would get the remaining stock. At some point, they also discussed the term "front end take out." Allen said that the term was explained to him as meaning a situation in which "the lender would lend enough money to allow the people that were going to develop the project to get their investment out * * * on the front so that the investors would actually have nothing invested in it and the lender would be the one with the entire investment responsibility." He agreed with plaintiffs that if their property was developed first, they could get their investment out of any profits which might be generated from the property. He told them that they would have to pay tax on those profits as dividends.

At some later date, plaintiffs and Allen met in the office of Attorney Ralph Madsen and told him that they had reached an agreement on setting up the corporation. At this meeting, each party agreed that they would put their property into the corporation, that John Pinelli would provide his ability as a building contractor, and that Allen would provide his bank connections and personal credit for the benefit of the corporation. They decided on the name of Alpine Corporation for their corporation and requested that Madsen draw up the appropriate papers and make the proper filings. The contract which Madsen drew up as the "Alpine Incorporation Agreement" was admitted into evidence. It did not contain any information on what property belonged to Alpine

Corporation. Also, it did not contain any reference to a "front end take out." However, it did recite that plaintiffs and Allen were entitled to stock. The agreement was signed by all three of the principals.

On June 23, 1964, Allen and plaintiffs met at the First National Bank to transfer their properties into Alpine Corporation. Allen said that there never was any agreement between the parties that the transfers would be for balance sheet purposes only. The court admitted into evidence a memorandum, written by Allen and dated July 24, 1975, indicating that the Dempster property was valued at $80,000 and the Park Ridge property was valued at $40,000 *for balance sheet purposes only.* When asked about this memorandum, Allen said that it was a suggestion which they made to their attorney, but that their attorney said that the idea was illegal and could not be carried out.

While at the First National Bank, plaintiffs executed a trust deed conveying their Dempster property to the bank as trustee under Trust Agreement No. 62. The trust agreement named Alpine Corporation as the beneficiary under the trust. Allen's Park Ridge property was already in Trust Agreement No. 53 at the First National Bank and he was the sole beneficiary under that trust. He said that he intended to transfer his property to Alpine Corporation; however, he was informed by the attorney for the bank, Marshall Howard, that he and plaintiffs could not obtain a $10,000 loan which was necessary for operating expenses for the corporation unless they used Trust No. 53 as collateral. Several letters, dated from July 16 to July 24, were admitted into evidence and they indicate that, at least at the time these letters were dated, Howard was in fact attempting to transfer the Park Ridge property into a trust for the benefit of Alpine Corporation.

In addition to Howard, the trust officer, the president, the executive vice president, and the loan committee also told Allen that he would have to use the Park Ridge property as collateral for the loan. He said that both he and plaintiffs objected to the bank president about this arrangement, but their objections were to no avail. Eventually, plaintiffs and Allen agreed to the use of the Park Ridge property as collateral. Allen said that they agreed to the use of the Park Ridge property as collateral because the Dempster property would be developed first and would need a mortgage for building expenses. He said that they did not want to further encumber the Dempster property by using it as collateral for a loan. The reason they were not going to develop the Park Ridge property first was that they were unable to obtain the proper zoning for that property.

Plaintiffs and Allen signed a promissory note at the First National Bank for the $10,000 loan. According to the terms of the loan, Allen assigned all of his beneficial interest in Trust Agreement No. 53 as security. A copy of a renewal of the promissory note was admitted into

evidence and the corporate name did not appear on the note. Nevertheless, the proceeds of the loan went into a bank account in the name of Alpine Corporation. The funds were ultimately used for permits and other general expenses relating to the Dempster property and "might" have been used to pay a tax bill on the Park Ridge property.

After obtaining the loan, the corporation functioned under the name of Alpine Corporation. The officers of the corporation included Allen as president, plaintiffs as vice presidents, and Madsen as secretary. The board of directors met on a number of occasions, but Allen said that there were no corporate minute books, corporate seal, corporate tax returns, or stock certificates issued. Later in his testimony, Allen stated that Madsen kept the minutes of the meetings of the board of directors. He also stated that although no stock certificates had been issued, he felt that he was entitled to stock in Alpine Corporation because he had given the corporation collateral and credit for the $10,000 loan. He also stated that Madsen was "given" one share of stock because he had said that he needed a share to be a director.

In August, Alpine Corporation began application to Draper and Kramer, Incorporated, for a mortgage loan on the Dempster property. Around this time, John Pinelli said that he wanted his $80,000 back. Allen told him that he could not get it back this way because the Dempster property, which had been valued at $80,000, had been placed into the corporation in return for its stock.

Sometime during application for the loan, Allen became aware that Alpine Corporation had not been incorporated. He said that he had originally been told by Madsen that the corporation had been incorporated in Delaware even though he said that he had never seen the incorporation papers. Later, Madsen first told him that Alpine Corporation had not been incorporated in Delaware and then he told him that he could not incorporate the corporation under the name of Alpine Corporation in Illinois. Madsen had been informed by the Secretary of State that the name "Alpine Construction Company" was already in use. At this point, Allen spoke to plaintiffs about the corporation's name on three or four occasions and, on one of these occasions, they all agreed to accept any name with the word "Alpine" in it. Although not clear from the record, at some point, Allen called the Secretary of State in plaintiffs' presence and cleared the name "Alpine Development."

On August 31, Allen and plaintiffs wrote Draper and Kramer to tell them that they had no objection to signing personal liabilities behind the corporate liability, and to tell them that they would not be taking out the loan under the name of Alpine Corporation because there was another corporation with a similar name. The letter, which was admitted into evidence, contained the purported signatures of Allen and plaintiffs. The

first loan application, dated September 8, was made under the name Alpine Corporation and was signed by Allen and plaintiffs. The second application for a loan of $280,000 was made under the name Alpine Development and signed by Allen as president of the corporation. This application was dated October 15. It was accepted and approved by both John Pinelli and Allen. The commitment for the mortgage was to Alpine Development. This commitment was dated October 27. Prior to the commitment, there was talk of dissolving the corporation so that plaintiffs could get their property back. Plaintiffs were concerned especially since Madsen had been slow in incorporating and had been having problems with the rezoning of the Park Ridge property. However, after the commitment was made, their concern apparently subsided.

On November 9, Alpine Development was incorporated in Illinois. After the incorporation, Allen and plaintiffs went to Madsen's office and insisted that they be shown the incorporation papers. Madsen showed them the papers and they were pleased that the incorporation had been finally accomplished. Allen said that there was no pre-incorporation subscription agreement for the incorporators of Alpine Development. He said that he thought that he had executed the articles of incorporation for Alpine Development, but he could not remember if plaintiffs did too. He also thought that the Dempster property had been transferred over to the benefit of Alpine Development. However, no changes had been made in Trust Deed No. 62 evidencing the change in names from Alpine Corporation to Alpine Development.

Initially, when called as plaintiffs' section 60 witness, Allen testified that he did not believe that plaintiffs received any stock in Alpine Development in 1964. He said that he believed that both plaintiffs received their stock certificates sometime in 1965. Later, when called as a defense witness, Allen testified that he personally delivered a stock certificate to John Pinelli in December of 1964. Throughout the trial, Allen maintained that Madsen had issued himself some stock in return for services which he rendered for the corporation.

Allen stated that plaintiffs were present at the meetings of the shareholders of Alpine Development from its inception until February 14, 1966, and they participated in the voting for directors. He said that John Pinelli held the records on the loan from Draper and Kramer and signed all payment authorizations to contractors and subcontractors. Although Allen claimed that the corporation's attorneys kept minute books, the books were not produced at trial.

In 1965, certain property owned by plaintiffs and located on Lawrence Avenue in Chicago (hereinafter, the Lawrence property) was transferred into Alpine Development. The corporation assumed the mortgage on the property as a favor to plaintiffs. The mortgage note was

admitted into evidence. The note was for the sum of $50,000 and was in the name of Alpine Corporation. It was signed by Allen as president and his wife as secretary and was dated July 21, 1964. Allen said that Henry Pinelli asked the corporation to assume the mortgage for a short period of time until he could refinance the property. At the time Alpine Development assumed the mortgage, it did not plan to build on the property. Later, the corporation made an attempt to get Federal guaranty financing for development of the property. However, the attempt failed. Since Alpine Development had no other assets to apply to the mortgage, it first offered the property back to plaintiffs for no consideration, but when they refused to take the property, the corporation notified the mortgagee bank that it would not oppose foreclosure. Allen claimed that the corporation never received any benefit from the property.

In mid-1965, Henry Pinelli came to Allen and said that he wanted to sell his interest in the corporation. He told Allen that he would take $30,000 for his interest, however, Allen told Henry that he would have to take $30,000 minus his proportionate share of the liabilities of the corporation. Henry agreed to the arrangement and Allen gave him a $10,000 initial payment on the purchase price. Allen stated that the original option to purchase form for Henry's stock did not list him as the purchaser because Henry did not want John to know that he was selling to him.

In September or October, Allen met with both plaintiffs. At the meeting, John objected to Henry's selling out to Allen on the ground that that now made him a minority shareholder. John expressed an interest in selling his stock and said that he would accept $35,000 from Allen for his share in the corporation. Later, when they became aware of an offer for the purchase of Allen's Park Ridge property, both plaintiffs told Allen that they wanted more money for their shares in the corporation.

Sometime in October, plaintiffs again met with Allen to discuss a new price for their shares in the corporation. Allen told them that the corporation owed $5,000 to a Stanley Howard, $10,000 to the First National Bank, and plaintiffs owed the corporation $3,800, and he said that the money had to come from somewhere. John then asked Allen for $50,000 for the purchase of his share, but he agreed to $45,000 when Allen agreed to pay off the debts and cancel out the $3,800 debt. The purchase price for Henry's stock remained at $30,000.

Allen said that as of February 13, 1966, just prior to finalization of the stock purchase, the corporate assets included the Dempster land and the apartment building which was 80% completed, the right of the corporation to the Park Ridge property, a small amount of cash, and the $3,800 debt of plaintiffs. The liabilities of the corporation included the

$280,000 mortgage on the Dempster property, the $10,000 loan from the First National Bank, and the $5,000 owed to Howard.

On February 14, 1966, Allen and plaintiffs met to finalize the sale of the stock. Allen's attorneys drafted all of the documents involved in the sale. The stock sale agreement was contained in contracts for the purchase of the stock and related escrow agreements. Under the terms of the contracts, plaintiffs agreed to sell their respective one-third of the stock in Alpine Development for the $45,000 and $30,000 prices already agreed to between the parties. Allen agreed to indemnify both plaintiffs against any claim or loss arising from their indebtedness to Howard and the First National Bank, and their personal guarantees on the mortgage taken out on the corporation's Dempster Street property. Also, each of the parties agreed to be responsible for one-third of the cost of construction on the Dempster property in excess of the original contract price of $280,000 provided that the amount did not exceed $12,000. Plaintiffs assumed sole responsibility for any amount in excess of the $12,000.

The escrow agreement provided for the disbursement of funds to the parties. Part of the proceeds in the escrow account came directly from Allen's sale of his Park Ridge property. Allen said that he sold the property for $58,000. When asked about the difference between the sale price and the $40,000 figure he had originally valued the property at, he said that the original $40,000 value was an undervaluation. He added that the Dempster Street property was overvalued at $80,000, even though an appraisal which was admitted into evidence indicated that it was worth $120,000. From the proceeds of the sale, $41,000 was used for the purchase of John's stock and $1,000 went toward the purchase of Henry's stock.

Allen said that since February 14, 1966, Alpine Development has made the principal and interest payment on the $280,000 mortgage loan. From February 14, to the time of the filing of the suit, neither Henry nor John had demanded return of the property, an accounting, or a financial report on the building. Also, at no time during this period did either of the plaintiffs offer to pay anything for managing the building.

The trial court said that it would take judicial notice of the court file indicating that Allen was suing the law firm which represented him at the closing for malpractice in failing to obtain the Dempster property in the proper way.

John Pinelli testified that he was a high school graduate with experience in the construction field, including ownership of his own construction company and work as a general contractor. He said that he had bought and sold vacant and improved property from time to time. Also, it was stipulated that he was president of P & O Investments, Ltd., in 1965.

John testified that he and his brother, Henry, had discussions with Allen about forming a corporation. Part of their discussions was on the subject of "front end take out." He said that Allen had told them that the term meant that the Dempster property belonged to them and the Park Ridge property belonged to him, and either property could be withdrawn from the corporation whenever the owner(s) wished. Allen stated that the reason the property was to be put into the corporation was so that they "would have a greater power to obtain the monies or construction costs or mortgage fees." John said that the "front end take out" arrangement became part of their basic agreement, and he was not aware that any changes had been made in this agreement. During the discussion of this term, there never was any talk of stock. Also, there never was any talk of what would happen to either plaintiffs' or Allen's ownership interest in the corporation if either the Dempster property or the Park Ridge property was taken out. When asked on cross-examination to pinpoint the date of the discussions on "front end take out," John stated that he did not know if they discussed the term before or after June 23, 1964.

John stated that when they reached an oral agreement to form Alpine Corporation, they agreed that the corporation was to take title to the Dempster property, the Park Ridge property, and the Lawrence property. They also agreed to form only one corporation. Allen told both John and Henry that Alpine Corporation had been incorporated after they had met with Madsen.

On June 23, 1964, John, Henry, and Allen signed a note to borrow $10,000 from the First National Bank. John said that he was not sure that a bank account was opened on that same day, but he believed that the money went into a bank account in the name of Alpine Corporation.

John said that he was never aware that a corporation by the name of Alpine Development was formed in place of Alpine Corporation. He said that Madsen was the attorney for Alpine Corporation, but that he had never been told by him that the corporation by the name of Alpine Corporation did not exist. He said that he first heard of Alpine Development after he hired an attorney for the instant suit in 1969 or 1970. Despite his statement, the court admitted into evidence several exhibits which could indicate that he had heard of Alpine Development prior to 1969 or 1970. The exhibits admitted by the court included: (1) the loan commitment made by Draper and Kramer to Alpine Development, dated October 27, 1964, and signed by John; (2) a Buy and Sell Agreement for the stockholders of Alpine Development, dated December of 1964, and signed by John; (3) a check of Alpine Corporation made out in payment of a debt of Alpine Development, dated May 15, 1965, and signed by John; (4) a letter concerning insurance on a building assumedly owned by Alpine Development, dated August 3, 1965, and sent to John; (5) a copy

of a letter which was addressed to Alpine Development and which authorized a sanitary sewer connection, dated August 24, 1965, and signed by John; (6) a consent of directors of Alpine Development to adopt certain resolutions, dated September 30, 1965, and signed by John; (7) a letter to the First National Bank which directed them to execute a certificate of trustee under Trust No. 62 indicating that the bank held title to the Dempster property and that Alpine Development was the sole beneficiary, dated September, 1965, and signed by John under the heading "Alpine Development Corp."; and (8) various other documents and letters. John was also asked about the letter sent to an agent of Draper and Kramer to notify them of the fact that the name "Alpine Corporation" could not be used. He explained his signatures on these documents by saying that he could not remember many of the signatures and that oftentimes he signed documents at Allen's insistence without first reading the documents. At one point in his testimony he stated that "Mr. Allen told me we had an attorney and I figured the attorney knew what he was doing and so did Mr. Allen because he is the educated one."

John stated that the money for the cost of the apartment building on the Dempster property was paid by the mortgage loan and by money out of his own pocket. He said that the loan from Draper and Kramer was made out to Alpine Corporation, but that Alpine Corporation did not exist. When asked who constructed the apartment building on Dempster, he first said Alpine Development, then said a corporation, and then finally said that he did. His explanation was:

> "I was the instrument to buy the property, which I did. I was the instrument in many of the cases to obtain contractors. I was there to supervise it and I did to the best of my ability. I have built it until it was ready for rentals. I rented many of the apartments."

As general contractor, he helped hire the subcontractors, arranged for the payouts from Draper and Kramer, obtained waivers of liens, and signed the contractors' statements. One of the general contractors' statements was admitted into evidence by the court and the statement indicated that John was general contractor with Alpine Corporation.

John stated that sometime in November he first heard that Allen had not put his Park Ridge property into a trust for the benefit of either Alpine Corporation or Alpine Development. The court admitted into evidence a letter from Attorney Madsen to the First National Bank. The letter, dated November 26, 1965, stated:

> "You have a trust which covers property located at the corner of Garden and Prairie in Park Ridge (the Park Ridge property). I am advised that the sole director of the trust is W. S. Allen. The beneficial interest in this property should have been assigned to Alpine Corporation. Until the question of this assignment is

resolved, please hold up any further actions relative to disposal of this property."

John said that he had heard this same information just before the letter had been issued. He also said that he had advised Allen of the party interested in purchasing the Park Ridge property, but that he had never expected to receive any of the money from the sale of that property.

John testified that he did not get any stock in Alpine Development in either 1964 or 1965. He said that prior to the sale on February 14, 1966, he believes that he had a conversation with Allen about selling some stock. He believed that Allen approached him and his brother asking them if they would sell their stock in the company which they had formed. He said that at the time of Allen's approach he did not know that he owned stock. He thought that what he owned was a one-third ownership interest in the company which they had formed. He thought that he was entitled to a one-third interest because he had put his Dempster property into what he thought was Alpine Corporation. Furthermore, he said that he understood that Allen was entitled to a one-third interest in the company because he placed his Park Ridge property into the corporation to make it "one unit so that they could go out and look good and get financial help in construction loans or mortgages."

At one point in the trial, John testified that the only time that he actually saw any stock was when he sold out on February 14. He said that there was never any written contract entitling him to one-third of the stock in Alpine Development. When he sold out, he said that he thought that he was selling Alpine Corporation stock to Allen. He said that when his attorney was negotiating with Allen to sell the stock, he thought that it was Alpine Corporation stock. Even though the contract for the sale of stock indicated that he was selling Alpine Development stock, he said that he did not actually read the agreement and that he "was told to sign it like many other papers." At another point in his testimony, John stated that he had actually "received" stock after putting his property into the corporation but before construction began. He said that he thought that he was entitled to Alpine Development stock because he had put his property into the corporation and because he had helped develop it.

John said that when he sold his stock to Allen he thought he was selling only his ownership interest in the company and his share in whatever profits would come from the development of the Dempster and Park Ridge properties and other things which they talked about. He said that he has never sold the Dempster property to anyone. John's 1966 tax return was admitted into evidence and it showed that John had sold certain vacant property on Dempster and sustained a loss of over $14,000. Although the Dempster property in dispute in this case was not vacant in 1966, John admitted that he only owned one piece of property on

Dempster Avenue. He said that his 1966 return was prepared by his accountant and that he imagined it was correct. Henry's 1966 tax return was also admitted into evidence and it indicated that he had realized a $5,000 gain on the sale of Alpine Corporation stock.

John's testimony on the subject of Alpine Development's assets as of February 14, 1966, was rather confused. At first, he testified that there were no assets. Then, he testified that there was not a corporation by the name of Alpine Development. Next, he said that he did not fully understand the question but that "[h]e had a 24 apartment building." When the court tried to clarify matters, John said that the corporation did not own anything because there was no corporation. He said that he received the $45,000 from Allen "[f]or being able to give him more power for construction, for the name." Finally, he told the trial judge:

> "Some of these questions I do not understand. Whether you believe it or not I am telling you the honest to goodness truth. That's why I had a smart partner Mr. Bill Allen who knew all, everything, who I looked upon as the Godfather.
>
> I called him Uncle Bill, I relied on his testimony. I relied on everything he said and everything he did."

John stated that after he sold the stock, Allen was supposed to manage the Dempster property. He said that it had been agreed that Allen would sell his home in Crystal Lake and move into the apartment building on Dempster. There had been some talk of paying Allen for managing the apartments, but John said that he did not believe that a figure had been mentioned. He said that he did not pay Allen and he did not know if Henry paid Allen. When asked if Allen was to be paid from some source other than out of pocket John said that "[b]eing a dummy I would say that he would take the money from the profit made from the apartment."

John stated that between February 14 and the filing of the present suit, he had many discussions with Allen concerning the station and condition of the Dempster property. At one point in these discussions, Allen told John that he did not know why he was so worried about the property since Allen had purchased the property from him. Suit was filed soon after this discussion.

Upon agreement of the parties, portions of Henry's pretrial deposition were read into evidence. In the deposition, Henry stated that he was employed as a real estate salesman, engaged mainly in the business of real estate financing. He said that he had never been in the construction business.

Henry said that when the corporation was set up, he and his brother had placed their Dempster property into the trust or the corporation. Also, Allen was going to put his Park Ridge property and his chain saw

factory into the trust or the corporation. He said that Allen handled all of the paperwork for the corporation. After Henry had negotiated with Allen over the purchase price of his stock, he hired an attorney to represent him. He said that as of January 31, 1966, the assets of Alpine were: (1) the Park Ridge property; (2) the Dempster property; (3) the chain saw factory; (4) approximately $600-700 in cash, and (5) perhaps, some other property.

Samuel Pfeffer testified that he was an attorney who represented plaintiffs in 1965 and 1966. He said that he had conversations with Allen's attorney, Gilbert Hennessey, regarding the sale of stock contract between Allen and his clients, but he did not enter into any negotiations over the purchase price. He stated that he could not remember telling Hennessey that they should terminate the relations between plaintiffs and Allen or that Allen should get the building in return for money. He denied knowing what the assets of the corporation were in 1966 and also denied knowing who held title to the Dempster property. He did say, however, that he recalled a conversation with John regarding a dispute between John and Allen over the Dempster property, but he could not recall the details.

Pfeffer's remembrance of the closing was also very minimal. He could remember that the Park Ridge property and Lawrence property came up, but he could not remember much more. He said that he could not recall telling Henry to bring his stock certificate to the closing and he could not recall any discussion of Henry's stock certificate at the closing.

Gilbert Hennessey testified that he was an attorney who represented Allen in 1965 and 1966. He said that he had a number of telephone conversations with Pfeffer in 1966. In one of them, he informed Pfeffer that Allen and plaintiffs were engaged in some sort of dispute and that he had advised Allen to get out "neatly." He told Pfeffer that he had suggested that Allen purchase plaintiffs' interest in the corporation which owned the apartment building.

## AMENDED PLEADING AND FINDINGS

Six weeks after the close of proofs, plaintiffs filed amendments to their second amended complaint, adding a count for a constructive trust. After realleging the basic facts of the first count, plaintiffs alleged that the proofs presented at trial indicated that the Dempster property and the Park Ridge property were both placed into the joint venture and were both to be treated in the same manner. Plaintiffs claimed that because Allen sold the Park Ridge property and kept all the proceeds of the sale, they had a similar right to own the Dempster property. The relief requested by plaintiffs included: (1) that the O'Hare International Bank be adjudged to hold title to the Dempster property for the plaintiffs and that

the bank be ordered to convey the property to plaintiffs; or (2) that the court rescind the stock purchase agreements and order that the funds received by Allen from the sale of the Park Ridge property be turned over to Alpine Development Corporation. Plaintiffs also requested such other relief as may be just, as they had done in previous pleadings.

On February 28, 1974, the trial court filed its memorandum opinion. One of its key findings was that Allen was not entitled to one-third of the stock in Alpine Development because he had failed to fulfill his promise to transfer his Park Ridge property into the corporation. Since Allen had failed to transfer his property, the sole asset in the corporation was the Dempster property. Therefore, the court held that plaintiffs were entitled to all the shares of stock in the corporation. The court further found that Allen owed plaintiffs a fiduciary duty because of his college training and his superior background in the area of finance. The court concluded that he breached that duty when he represented to plaintiffs that they were entitled to only two-thirds of the shares of the stock instead of the 100% which they were entitled to by virtue of their transfer of the Dempster property.

As a result of its findings, the court rendered judgment in plaintiffs' favor and dismissed Allen's third-party complaint and defendants' amended counterclaim. As relief, the court gave plaintiffs one of three options, including the right to rescind the stock purchase agreements. Plaintiffs chose the option to rescind.

On June 18, defendants filed a motion to reopen proofs to meet the allegations of plaintiffs' amendment to their second amended complaint. Defendants claimed that the request for rescission in that pleading took them by surprise. The court denied the motion and on July 5, entered judgment in plaintiffs' favor.

On appeal, defendants raised the following issues: (1) Whether a judgment in plaintiffs' favor may stand where the proof fails to support the allegations of their complaint and where neither their pleadings, proof, nor prayers for relief seek the remedy granted; (2) whether the filing of amended pleadings raising a new legal theory and seeking new relief six weeks after the conclusion of all of the evidence should be allowed; (3) whether plaintiffs' claims for rescission are barred by laches; (4) whether plaintiffs' repeated affirmance of the stock sale agreement after obtaining knowledge that they might have a right to rescind constitutes an election of remedies barring subsequent rescission; (5) whether the judgment may stand where the findings and judgment of the trial court are, in critical respects unsupported by the evidence and based on erroneous conclusions of law; (6) whether it was error to deny defendants' motion to reopen proofs; and (7) whether it was error for the court to dismiss the counterclaim without hearing evidence. By order, we

reversed that part of the judgment order of July 5, 1974, rescinding the stock sale agreements and dismissing the counterclaim of Alpine Development Corporation and remanded the cause to the circuit court "with directions to reopen proofs on the amendment to the second amended complaint and to hear evidence on the counterclaim of Alpine Development Corp."

## REMANDED PROCEEDINGS

Before evidence was heard on the remanded issues, defendants moved the court for a continuance on the ground that Allen was recuperating from a heart attack and was unable to testify at the hearing. The court denied the motion. Additionally, the court ruled that evidence would be heard first on the order to reopen proofs on the amendment to the second amended pleading, and that proof would only be heard on the counterclaim if necessitated by the decision at the first proceeding.

At the hearing, defendants called only two witnesses, Sam Pfeffer and Ralph Madsen. Pfeffer testified that he had represented plaintiffs from time to time in the 1960's. In particular, he remembered representing them in connection with a company named P & O Investments and in connection with a business relationship with William S. Allen. The representation with regards to the relationship with Allen lasted for about one year.

Regarding the business relationship with Allen, Pfeffer first remembered that an Alpine Corporation was involved and that certain properties were to be placed "in the pot." Later, he said that he could not remember the name of the entity involved. He specifically remembered the Dempster property and also remembered other parcels of property which he thought were solely in Allen's name or in some entity which was owned by Allen. He said that all of these properties were to be put into the pot and that his client, John, was worried that Allen had not put his property into the pot. Pfeffer said that he talked to Allen about this and told him "that he should do whatever he was supposed to do." He said that he had heard that Allen was going to try to sell his properties and he told Allen that that was not part of the business arrangement between him and plaintiffs.

Pfeffer said that he remembered talking with Allen's attorney, Madsen, about setting up some meetings to resolve the dispute, but that he could not remember many of the specifics. By December of 1965, he was told by plaintiffs that they were entitled to stock. In December 1965, Pfeffer knew that Allen's property had not been placed into the corporation. In a letter, dated December 23, 1965, he offered Madsen a solution to the dispute. He suggested terms which would be agreeable to his clients. In the final paragraph of the letter, however, he stated:

"I know you had informed me that you had discussed the attempted sale by Bill Allen of the Garden and Prairie property (the Park Ridge property), and that he has been advised by you as his attorney that this would be a fraudulent action on his part against Henry and John Pinelli. I do recommend, however, that if this cannot be concluded immediately, that a meeting be held relative to a stock purchase, the corporate minutes and the issuance of a stock certificate and have Allen place this property into the corporation which should have been done a year and a half ago."

Pfeffer said that he did not recall what was meant by the final sentence of this letter. When shown copies of the stock sale agreements, he could not say that these documents were apparently intended to resolve the differences between plaintiffs and Allen.

Madsen testified that he had represented both plaintiffs and Allen separately in legal matters other than those involving the corporation. He represented both Allen and plaintiffs with regards to the incorporation of Alpine Development Corporation. He said that prior to the incorporation, Allen had introduced him to plaintiffs and they discussed a number of matters including: (1) combining the Dempster and Park Ridge properties into a corporation for the purpose of development, (2) arbitrarily setting value on the properties, and (3) having each person receive a one-third ownership interest in the corporation. He said that he incorporated Alpine Development and, within days, informed plaintiffs of the incorporation. Shortly after the incorporation, he prepared and issued stock to Allen and plaintiffs. He issued their stock after he had obtained their signatures. The court admitted into evidence copies of a stock certificate in Alpine Development issued to Henry and of a receipt for a stock certificate in Alpine Development issued to John. Both copies were dated November 20, 1964. He said that he next saw Henry's stock certificate when Henry asked him to hold them after he had agreed to sell the stock to Allen.

Madsen stated that he became secretary of Alpine Development because plaintiffs did not want to appear as officers of the corporation. The reason for their reluctance was that they had just placed the Lawrence property into the corporation and, since it was delinquent while it was in their hands, they did not want their participation in the corporation to interfere in any way with the corporation's assumption of the mortgage. Madsen said that there was talk of high-rise construction on the Lawrence property and that he supposed that the parties thought that the Lawrence property had a substantial value from the point of development.

About a year after incorporation, Madsen had several talks with

Pfeffer about the sale of Alpine. He specifically remembered one conversation which he had in Pfeffer's office when both plaintiffs and Allen were present. He recalled discussing the sale and the various particulars about the sale price. He said that he was sure that the subject of Allen's failure to place his property into the corporation was discussed. He said that he had previously discussed this subject with plaintiffs. Also, he recalled telling both Allen and plaintiffs that Allen could not sell the Park Ridge property on his own without the sale being improper.

On November 8, 1976, the trial court entered an order adopting and reaffirming its order of July 5, 1974, except for that part of the order referring to the amended counterclaim of Alpine Development Corporation. The court vacated the dismissal of the counterclaim and ordered the matter heard by another judge of the circuit court to an extent not inconsistent with the court's order. The trial court also made its order final and appealable.

On the present appeal, defendants raise three new issues: (1) Whether the trial court abused its discretion in denying defendants' motion for a continuance; (2) whether the November 8, 1976, order of the trial court was in conformity with the earlier mandate of this court; and (3) whether the November 8 order is final and appealable. We will consider these three issues together with the five issues left undecided by our earlier ruling.

## Opinion

The first issue raised is whether the judgment in plaintiffs' favor may stand where the proof fails to support the allegations of their complaint and where neither their pleadings, proof, nor prayers for relief seek the remedy given. Defendants specifically argue that plaintiffs have not properly alleged and proven rescission and that the relief which the trial court gave plaintiffs was different than the relief which they had requested.

■■ Initially, we note that we, as an appellate court, have the power to amend the pleadings on our own motion if necessary to conform the pleadings to the proof. (Ill. Rev. Stat. 1971, ch. 110A, pars. 362(f), 366(a)(1); *Pettit v. Pettit* (1978), 60 Ill. App. 3d 375, 376 N.E.2d 782; *Harris v. Shuman* (1973), 11 Ill. App. 3d 894, 298 N.E.2d 341; *Simonson v. Simonson* (1970), 128 Ill. App. 2d 39, 262 N.E.2d 326.) In light of the circumstances and facts of this case, an amendment upon our own motion would be appropriate if necessary. Nevertheless, since we find that the proof supports the allegations, we need not take that step here.

■■ Rescission is an appropriate remedy when there has been some fraud in the making of a contract. (*Farmers Automobile Insurance Association v. Pursley* (1971), 130 Ill. App. 2d 980, 267 N.E.2d 734.) In alleging fraud

as grounds for the rescission, plaintiff must state facts from which fraud is the necessary or probable inference. (*Browning v. Heritage Insurance Co.* (1975), 33 Ill. App. 3d 943, 338 N.E.2d 912.) Facts must be pleaded so that the opposite party is apprised of what he must answer. *Zickur v. Irmiger* (1973), 15 Ill. App. 3d 805, 304 N.E.2d 635.

In the amendments to their second amended complaint, plaintiffs stated that according to a memorandum written by Allen and certain testimony at trial both the Dempster and Park Ridge properties were placed in the joint venture and were to be treated in the same manner. When Allen removed his property from the joint venture and ultimately sold it and retained the proceeds, plaintiffs thought that they had the right to treat their property similarly. Thus, when Allen purchased their stock, they did not believe that they were selling their Dempster property.

■■■ We believe that these allegations are sufficient to apprise Allen of the fraud with which he is being charged. A crucial finding of the trial court was that plaintiffs and Allen had agreed to transfer their respective properties into the corporation, but that Allen had failed to do so. As a result of his failure to transfer his Park Ridge property despite his representation that both properties would be treated similarly, Allen was not entitled to a one-third share in the stock of the corporation. Therefore, when he offered to purchase plaintiffs' two-thirds shares, he not only made a misrepresentation that he owned one-third of the stock but he also made a misrepresentation that plaintiffs were the owners of only two-thirds of the corporate stock when, in fact, they were entitled to be the owners of all of the stock in the corporation by virtue of supplying the sole corporate asset. Since these misrepresentations were directly related to Allen's representation that both properties would be treated similarly the allegations of this pleading were sufficient for the rescission requested in this case.

■ The proof in this case amply supported these allegations. The proof supported the contention that both the Dempster and Park Ridge properties were to be treated similarly. Both John Pinelli and Allen testified that the properties were to be treated in the same manner. They only differed in that John stated that Allen told him that the properties were to be transferred into the corporation for balance sheet purposes and Allen stated that he told plaintiffs that the properties were to become part of the corporate assets. The proof supports the allegation that Allen never did transfer his property to the corporation and that he did in fact sell the property and retain the proceeds. Although Allen testified that he never saw the proceeds and that they went directly into the escrow account, we think that there is sufficient proof to establish the allegation that the proceeds never went directly into the corporation. Also, there is proof in this case to support the allegation that plaintiffs were not aware

that they were selling their interest in the Dempster property when they sold the stock. Even though there is conflicting proof on this allegation, in the nature of John's 1966 tax return and in various statements which John made at trial, we see this merely as a question of credibility which is, of course, for the trier of fact to determine. *Glass v. Burkett* (1978), 64 Ill. App. 3d 676, 381 N.E.2d 821; *Logan v. State Farm Life Insurance Co.* (1978), 61 Ill. App. 3d 770, 378 N.E.2d 395.

██ Although it is true that plaintiffs have never alleged that their property and Allen's property were to become corporate assets or that Allen's failure to transfer his property into the corporation made them absolute owners of all the stock, we believe that their failure to plead such facts manifests their total confusion over what Allen was actually trying to do in this business relationship. This confusion is demonstrated even in the pleading which they filed at the close of all the evidence. They alleged that the proof showed that the property was to be treated "in the same manner," but they did not explain what was meant by "in the same manner." However, we cannot say that Allen shared this confusion. We believe that the record establishes that he knew what he was being charged with from the very start. He testified that he had initially agreed to transfer his property into the corporation, but that he had not done so. The trial court felt that a man with his background should have known the consequences of his failure to transfer his property into the corporation. Furthermore, we believe that if plaintiffs' request for rescission did in fact come as a complete surprise to Allen, he had an adequate opportunity to answer in the remanded proceedings. Having failed there, we cannot say that his argument has any merit at this stage of the proceedings.

We also find defendants' argument that the judgment should not stand because the relief granted by the trial court was different than any relief pleaded, proved or requested to be without merit. Throughout the proceedings in this matter, plaintiffs have sought the return of their property. Originally, they proceeded on a theory of resulting trust. After trial, they added a count for a constructive trust and asked for a return of their property or, in the alternative, for rescission of the stock sale agreements. In asking for a rescission, however, they requested that the proceeds of the sale of the Park Ridge property be put into the corporation. The court, however, granted plaintiffs the option of rescinding and, instead of requiring Allen to put the proceeds into the corporation, it required plaintiffs to return the purchase price of their stock to Allen and to reimburse him for any corporate debts which he had paid since the sale of the stock. By doing so, plaintiffs became the owners of all the stock in the corporation and its sole asset, the Dempster property.

██ Although the relief given by the court was not precisely the same

relief requested by plaintiffs in their last pleading, it is well-settled law that a trial court may grant relief other than the relief requested provided the adverse party is not prejudiced by reason of surprise. (Ill. Rev. Stat. 1971, ch. 110, par. 34; *City of Chicago v. Nielsen* (1976), 38 Ill. App. 3d 941, 349 N.E.2d 532.) In the present case, in light of the pleadings and proof, both at trial and at the remanded proceeding, we cannot say that defendants have been prejudiced by reason of surprise. As noted, from the very start of this litigation, plaintiffs have sought a return of their property. They have utilized different theories at different times in order to get their property back. In their final pleading, they sought rescission. Although the relief granted was not precisely what was requested, defendants cannot argue that they did not know plaintiffs were seeking a return of their property. When defendants initially appealed this matter, we remanded the proceedings so that they could adequately respond to plaintiffs' request for rescission. Defendants did present evidence, but, nevertheless, the trial court affirmed its earlier decision. In light of this history, we see no reason to disturb that finding.

Defendants' next contention is that the trial court should not have allowed plaintiffs to file amended pleadings raising a new theory of constructive trust and seeking a new relief of rescission six weeks after the close of proofs.

Section 46(3) of the Civil Practice Act (Ill. Rev. Stat. 1971, ch. 110, par. 46(3)) authorizes a trial court to allow amendments of pleadings, at any time before or after judgment, in order to conform the pleadings to the proof. Absent an abuse of discretion, the decision of the trial court will not be reversed. (*Frey v. Belleville News-Democrat, Inc.* (1978), 64 Ill. App. 3d 495, 381 N.E.2d 705.) The test to be applied in determining whether the trial court has abused its discretion is to ask whether the trial court's decision furthers the ends of justice. *City of Des Plaines v. Pollution Control Board* (1978), 60 Ill. App. 3d 995, 377 N.E.2d 114.

██ We believe that the trial court did not abuse its discretion in allowing plaintiffs to amend their complaint to include a count for a constructive trust. During the course of the trial, the proof began to indicate the possibility of plaintiffs' proceeding on a theory of constructive trust. After John Pinelli had testified on direct examination, the trial court, while commenting on defendants' motion to strike John's testimony, first noted the possibility of a constructive trust. Counsel for defendants argued the absence of fraud, but the trial court suggested that the fraud was in the inducement, apparently referring to Allen's failure to transfer his property into the corporation. During cross-examination of John, counsel for defendants once again raised the possibility of a constructive trust when he attempted to ask John a question for the purpose of determining whether any misrepresentation had been made in the business dealing

between plaintiffs and Allen. The court permitted counsel to ask the question despite objection by plaintiffs' counsel. Once again, at the close of plaintiffs' case, defendants' counsel, while arguing for a judgment in defendants' favor as against Henry Pinelli, recognized the possibility of a constructive trust. This record clearly indicates that defendants were aware of the constructive trust theory at an early enough stage of the proceeding to offer proof to rebut the constructive trust theory.

Since there was no unreasonable surprise in this instance (*Kappatos v. Gray Co.* (1970), 124 Ill. App. 2d 317, 260 N.E.2d 443) and since some portion of the proof in this case supported a theory of constructive trust (see *Spence v. Commonwealth Edison Co.* (1975), 34 Ill. App. 3d 1059, 340 N.E.2d 550), we believe that it was in the interest of justice to allow plaintiffs to amend their complaint to include a count for constructive trust. Additionally, although on the first appeal of this case, we decided that defendants had been unduly surprised by plaintiffs' amendment which requested the relief of rescission, we believe that the remanded proceedings cured any earlier error on the part of the trial court. See *Sweeney v. Matthews* (1968), 94 Ill. App. 2d 6, 236 N.E.2d 439.

Defendants next contend that plaintiffs' claims for rescission are barred by laches. They argue that plaintiffs knew all of the facts which dictated rescission either as early as February of 1966, when they sold their stock, or no later than August of 1970, when they filed suit. Despite this early knowledge, plaintiffs did not request rescission until December of 1973. Defendants contend that as a result of plaintiffs' delay in requesting rescission, laches should be found as a matter of law and the judgment of the trial court should be reversed.

■■ A party seeking to rescind a contract on grounds of fraud or misrepresentation must elect to do so promptly after learning of the fraud or misrepresentation. (*Mollihan v. Stephany* (1975), 35 Ill. App. 3d 101, 340 N.E.2d 627.) Whether the party's delay is enough to constitute laches depends upon the circumstances of each case. (*Bobin v. Tauber* (1976), 45 Ill. App. 3d 831, 360 N.E.2d 368.) Laches will not be found if the delay is short of the statutory period of limitations and there has been no change of circumstances. *Colucci v. Chicago Crime Com.* (1975), 31 Ill. App. 3d 802, 334 N.E.2d 461.

■■ Plaintiffs' claims for rescission are not barred by laches in this case. The trial court found that although plaintiffs maintained that they did not know that their Dempster property became a corporate asset, they were estopped from denying it because they joined in procuring the Draper and Kramer mortgage loan in the name of Alpine Development. Nevertheless, this finding is not dispositive of the question of when plaintiffs became aware of the facts which dictated rescission. Although plaintiffs were estopped from denying that the Dempster property

became a corporate asset, they did not become aware of Allen's fraud or misrepresentation until the close of the evidence. The evidence indicated that Allen had agreed to place his property into the corporation and to treat it in a manner similar to that of the Dempster property, but that he did not do so. He withdrew his property, sold it, and used the proceeds for his own benefit. Yet, he testified that when he purchased plaintiffs' stock in the corporation, he was purchasing the Dempster property. He also represented to plaintiffs at the time of the sale that he owned one-third of the corporate stock and that they were the owners of two-thirds of the stock. This was clearly a misrepresentation since he was not entitled to a one-third interest in the stock of the corporation by virtue of his removal and personal use of the proceeds of the sale of the Park Ridge property. In light of this information which only came out at trial, we cannot say that plaintiffs did not act promptly when they filed their request for rescission within six weeks of the close of proofs.

Furthermore, defendants have claimed no change of circumstances by virtue of the "late" filing of plaintiffs request for rescission. Although the record does indicate that Allen sold his home in Crystal Lake to take over management of the Dempster property, we are not told how this move has prejudiced Allen or the other defendants. Since there was no claim of a change of circumstances by virtue of plaintiffs' amendments three years after the initial filing, and since there is no claim that any of plaintiffs' filings were not within the statute of limitations, we conclude that the doctrine of laches is inapplicable here.

Defendants next contend that plaintiffs' repeated affirmance of the stock sale agreements, after obtaining knowledge that they might have a right to rescind, constituted an election of remedies barring a subsequent rescission. Defendants argue that plaintiffs repeatedly affirmed the validity of the stock sale agreements in verified pleadings. Also, they argue that John Pinelli's 1966 income tax return which indicated that he had sold the Dempster property is further proof of their ratification of the stock sale agreements.

■■ In order for the doctrine of election of remedies to apply, the pleading party must be aware of the true facts of a situation. (*Household Finance Corp. v. Suhr* (1963), 44 Ill. App. 2d 292, 193 N.E.2d 611.) Plaintiffs did not become aware of the facts which dictated rescission until the close of proofs. Six weeks later, they amended their pleadings by adding a request for rescission or a constructive trust to their already existing request for a resulting trust. The added request for rescission was proper in light of the recently acquired facts of the situation and, thus, is not barred by the doctrine of election of remedies. Also, the doctrine of election of remedies does not apply when inconsistent or alternative remedies are joined in the same pleading. *Walsh v. Oberlin* (1971), 2 Ill.

App. 3d 987, 276 N.E.2d 728. See *Bozeman v. Sheriff* (1976), 42 Ill. App. 3d 228, 355 N.E.2d 624.

■■ The fact that John Pinelli's 1966 tax return indicated that he had sold the Dempster property does not indicate that he was aware of the facts which only came out at trial. Although it constitutes some evidence that he knew that he was selling the Dempster property at the time of the sale of stock, it does not show that at the time of the sale he was aware of the misrepresentations which Allen was charged with in the final pleading. Therefore, the tax return is not dispositive on the question of the applicability of the doctrine of election of remedies.

Defendants' next contention is that the "key" findings of the trial court are unsupported by the evidence and based on erroneous conclusions of law. They indicated that the "key" findings are: (1) that plaintiffs did not know the Dempster property became a corporate asset; (2) that plaintiffs did not know that they were entitled to stock in Alpine; (3) that Allen had agreed to transfer his property to the corporation in exchange for stock, but he failed to do so; (4) that Allen used the proceeds of the sale of the Park Ridge lots to purchase plaintiffs' stock; and (5) that Allen owed plaintiffs a fiduciary duty and they relied on him and placed their full confidence in him to manage their affairs.

The findings of a trial court must be based upon evidence which appears on the record. (*National Boulevard Bank v. City of Chicago* (1970), 123 Ill. App. 2d 166, 259 N.E.2d 862.) In reviewing the findings of a trial court, we must not set aside the findings unless we determine that they are against the manifest weight of the evidence. (*John J. Calnan Co. v. Talsma Builders, Inc.* (1977), 67 Ill. 2d 213, 367 N.E.2d 695.) In making this determination, we must bear in mind that questions of credibility are for the trier of fact. *Glass v. Burkett* (1978), 64 Ill. App. 3d 676, 381 N.E.2d 821.

■■ Upon careful review of the record in this case, we note that there is sufficient evidence to support each of the findings which defendants refer to us. Although it is true, as defendants point out in their briefs, that the testimony in this case was often conflicting and inconsistent, these conflicts and inconsistencies are matters which go to the credibility of the witnesses. Since we do not find that the trial court's determination of these matters was contrary to the manifest weight of the evidence, we cannot set aside its findings.

Defendants next contend that upon remand the trial court failed to comply with our mandate. In our order of June 11, 1976, we directed the trial court as follows:

> "That part of the judgment order of July 5, 1974 rescinding the agreements of February, 1966 is reversed and the order dismissing the counterclaim of Alpine Development Corp. is also reversed

and the cause remanded with directions to reopen proofs on the amendment to the second amended complaint and to hear evidence on the counterclaim of Alpine Development Corp."

Upon remand, the trial court initially decided to hear evidence on the amendment to the second amended complaint first and then, only if necessitated by the decision on the first issue, to hear evidence on the damage claim made in the counterclaim. After rendering its decision on the amendment to the second amended complaint, the trial judge, who was soon to retire, decided that it would be proper to let whatever chancellor succeeded him hold hearings on the counterclaim together with any accounting necessitated by the court's decision to rescind. Defendants argue that the court's decision to sever the issues was not in keeping with our mandate and, thus, this cause should be once again remanded.

■■ After an appellate court has reversed and remanded the judgment of a trial court, the trial court must proceed with the matter according to the specific directions of the reviewing court. (*City of Lockport v. County Board of School Trustees* (1976), 42 Ill. App. 3d 578, 356 N.E.2d 420.) However, if specific directions are not given, "it is then the duty of the trial court to examine the appellate court's opinion and determine from it, and the nature of the case, what further proceedings would be proper and not inconsistent with the opinion." *Gieseke v. Hardware Dealers Mutual Fire Insurance Co.* (1965), 61 Ill. App. 2d 119, 122, 208 N.E.2d 900, 902.

■■ Although we ordered the trial court to hear evidence both on the amended pleading and the counterclaim, we did not direct the trial court to hear both matters at the same time. The trial court decided that it would be more appropriate to sever the issues and to hear evidence on the amended pleadings first. Its decision was initially predicated on the belief that if the decision to grant rescission were affirmed, there would be no need to get into the question of the counterclaim since plaintiffs would be absolute owners of the corporation and would thus be liable for all its debts and obligations. After the hearing on the first issue, the trial judge then assigned the counterclaim, together with an accounting which was required by the rescission, to be heard by his successor. The court predicated this decision on the belief that some money might be owed to Allen by virtue of the claim made in his counterclaim and, we believe that the court's later decision was proper under the mandate which we gave and in light of the lengthy course of this lawsuit. Therefore, we conclude that there is no need for a remand under this issue.

Defendants' next contention is that the November 8, 1976, order of the trial court was not final and appealable since the question raised by the counterclaim had not been resolved. The order of the court included a .

specific finding that "[t]here is no just reason for delaying the enforcement of or appeal from this order."

■■ An order will not be considered final and appealable unless it disposes of or terminates the litigation or some definite portion of the litigation on its merits. (*Village of Niles v. Szczesny* (1958), 13 Ill. 2d 45, 147 N.E.2d 371; *Coble v. Chicago Health Club, Inc.* (1977), 53 Ill. App. 3d 1019, 369 N.E.2d 188.) A specific finding by the court that there is no just reason to delay appeal is not dispositive if in fact the order is not final. (*Crane Paper Stock Co. v. Chicago & Northwestern Ry.* (1976), 63 Ill. 2d 61, 344 N.E.2d 461.) An order may be final if all that remains undecided is an incidental accounting. *Barnhart v. Barnhart* (1953), 415 Ill. 303, 114 N.E.2d 378; *Department of Transportation v. Schien* (1977), 50 Ill. App. 3d 73, 365 N.E.2d 702.

■■ We believe that the present case is properly before us because the trial court disposed of a definite portion of the litigation between the parties with its decision at the remanded proceeding. In affirming its earlier order granting rescission, the court decided the question of ownership of the Dempster property. This was the crucial question raised in this lawsuit. The counterclaim involved merely an incidental accounting matter which could be properly resolved in a separate proceeding. A final resolution of that matter is not necessary for purposes of this appeal. Therefore, we conclude that the November 8, 1976, order of the trial court was final and appealable.

Lastly, defendants contend that the trial court abused its discretion in denying their motion to continue the trial date of the remanded proceeding due to the medical impossibility of Allen to appear and testify. Three days prior to the date set for the remanded proceeding, defendants argued a motion to continue on grounds that Allen had just been released from the hospital after having suffered a heart attack and thus, he could not testify. Counsel for defendants stated that Allen was a necessary witness "particularly on the counterclaim." Nevertheless, the trial court denied the motion. In so doing, the court noted that, if necessary, evidentiary depositions could be taken at Allen's home. Defendants contend that the court's decision to deny the motion was an abuse of discretion in that the trial judge was merely trying to clear his calendar before his imminent retirement from the bench.

■■ The decision to grant a continuance is within the sound discretion of the trial court and a reviewing court will not overturn that decision unless there is evidence on the record that the court has abused that discretion. (*Wilson v. Reeves Red-E-Mix Concrete Products* (1975), 29 Ill. App. 3d 448, 330 N.E.2d 521.) A trial court's decision to deny a motion to continue on grounds of the medical impossibility of a witness to testify will not be considered an abuse of discretion absent a showing that the witness'

testimony will be material. *Wicks v. Chicago, Burlington & Quincy R.R. Co.* (1971), 132 Ill. App. 2d 33, 267 N.E.2d 727.

■ Although we are not unmindful of the potential for injustice in a situation where a trial judge is attempting to hear as many matters as possible before his impending retirement from the bench, we are certain that there was no injustice in the instant decision to deny the motion to dismiss. The record indicates that counsel for defendants was only interested in calling Allen as a witness on the issue of the counterclaim. At the very beginning of the arguments on the motion to continue, counsel for defendants stated that Allen was a necessary witness particularly on the question of the counterclaim. Again, at the end of the arguments, he stated that he did not expect to call Allen as a witness on the hearing on the amended pleadings. Since Allen was not even expected to testify on the reopening of proofs portion of the remanded proceedings, let alone be a material witness, we cannot say that the trial court abused its discretion in denying the motion to continue.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

LORENZ and MEJDA, JJ., concur.