FIRST DIVISION
FEBRUARY 19, 2008

No. 1- 06-0861


| | | |
|---|---|---|
| FANE LOZMAN and BLUE WATER PARTNERS, INC., | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | |
| GERALD D. PUTNAM, TERRA NOVA TRADING, L.L.C., STUART TOWNSEND, MARRGWEN TOWNSEND, TOWNSEND ANALYTICS, LTD., CHICAGO TRADING AND ARBITRAGE, L.L.C., ARCHIPELAGO, L.L.C., ARCHIPELAGO HOLDINGS, L.L.C., GDP., INC, and VIRAGO ENTERPRISES, L.L.C., | ) ) ) ) ) ) ) ) | Honorable Allen S. Goldberg, Judge Presiding. |
| Defendants-Appellees. | ) ) ) | |

JUSTICE ROBERT E. GORDON delivered the opinion of the court:

Plaintiff Fane Lozman and defendant Gerald Putnam were business associates whose relationship turned sour. On April 17, 1995, they signed a written agreement regarding the sharing of revenues and commissions. Just six months later, on October 9, 1995, they signed mutual releases that voided their April 17 agreement.

After a dual bench and jury trial,[1] the circuit court of Cook County held on July 2, 2005,

---

[1]Prior to the start of trial, the trial court ruled that any jury findings concerning the

that the release and the doctrine of *laches* barred plaintiffs' cause of action for usurpation of corporate opportunities.  Lozman v. Putnam, Nos. 01 L 16377,  99 CH 11347, 21, 27 (Circuit Court of Cook County), (hereinafter Lozman).

The plaintiffs are Lozman and Blue Water Partners, Inc. (BWP), an Illinois corporation. Lozman and Putnam were both officers in BWP prior to the execution of the release; and it is BWP's corporate opportunity that Lozman claimed Putnam usurped.

The Putnam-related defendants include:   Terra Nova Trading, L.L.C, an Illinois limited liability company established by Putnam which received, according to Lozman,  the corporate opportunities usurped from  BWP; and Archipelago, L.L.C. and Archipelago Holdings, L.L.C, Illinois limited liability companies established by Putnam subsequent to Terra Nova and which Lozman claimed were the ultimate recipients of the opportunities usurped from BWP.  Plaintiff also claimed that GDP, Inc. (i.e.,  Gerald D. Putnam) received corporate opportunities usurped from BWP.  Putnam is the sole shareholder and director of GDP, Inc., an Illinois corporation.

In addition to the Putnam defendants, there are the Townsend defendants: Stuart and Marrgwen Townsend, the computer programmers who programmed brokerage and trading software for BWP; and Townsend Analytics, Ltd., (TAL), their programming firm, which is an Illinois corporation. The trial court found that it was plaintiff Lozman who introduced the Townsends to defendant Putnam, and that BWP's relationship with the Townsends was a valuable asset used to establish Terra Nova.

---

parties' equitable claims were merely advisory.

Defendant Chicago Trading and Arbitrage, L.L.C. (CTA),[2] was a small order execution system (SOES) trading business, formed by Putnam and the Townsends and located in the same office as BWP and Terra Nova. Plaintiffs alleged that they were entitled to revenues generated by CTA, an Illinois limited liability company.

Although court orders dismissing counts against defendants CTA and Virago Enterprises, L.L.C. were named in the notice of appeal, plaintiffs' appellate brief makes no arguments with respect to these two defendants and thus these two defendants are not part of this appeal.

For the reasons discussed below, we affirm the order and opinion of the trial court.

BACKGROUND

The Partnership

Plaintiff Lozman and defendant Putnam met in 1986, when they both worked for the Chicago securities firm of Walsh Greenwood. Lozman later developed the idea for ScanShift, a computer program for traders that displayed trading and price data based on the appearance of a pilot's controls in an airplane, rather than in rows and columns. Lozman had previously been a pilot with the United States Marines.

In January 1994, Lozman contacted the computer programming firm of defendant TAL to program ScanShift. TAL owned and marketed its own software program called RealTick which

---

[2]The abbreviation "CTA" for Chicago Trading & Arbitrage, L.L.C. was used by the appellate court in Lozman v. Putnam, 328 Ill. App. 3d 761 (2002). We will use the same abbreviation for the sake of consistency.

displayed the trading prices of stocks. Lozman wanted to program ScanShift so that it appeared as a "window" or component of RealTick. TAL is owned by defendants Stuart and Marrgwen Townsend.

In February 1994, Lozman discussed ScanShift with Putnam. Putnam then approached the law firm of Foley & Lardner to incorporate BWP, which was done on March 28, 1994. Putnam was the president and Chief Executive Officer of BWP, and Lozman was the vice-president and the chairman of the board of directors. Putnam and Lozman were also directors and equity shareholders, with each owning 50%. [3]

Lozman testified that he and Putnam had agreed to form a broker-dealer firm to "soft-dollar" ScanShift, so that the software could be furnished in exchange for brokerage commissions. With soft-dollar brokerage, the customer receives software from the brokerage firm in exchange for giving the brokerage firm commissions for the customer's trades.

On June 6, 1994, Lozman and Putnam met with the Townsends at their offices to discuss programming ScanShift to work with RealTick. In June and July 1994, Putnam and Lozman offered the Townsends a 15% equity in and 15% profits of BWP, in return for the Townsends' programming work on ScanShift. However, the Townsends never became officers, directors or controlling shareholders of BWP. Lozman claimed that it was during this time that he disclosed

---

[3]On April 5, 1994, Putnam filed an SS-4 federal employer identification form, on which he stated that the principal activity of BWP was as a "securities broker-dealer providing broker-dealer services."

to Putnam and the Townsends his knowledge of: small order execution system (SOES), a form of electronic trading; trading room business; electronic trading; and an electronic stock exchange. On October 12, 1994, Lozman assigned his rights in ScanShift to BWP. [4] Lozman and Putnam agreed that BWP would receive the brokerage commissions from traders, as a result of BWP furnishing computer software to traders. [5]

On November 14, 1994, Terra Nova Trading, L.L.C. was incorporated in Illinois, with Putnam owning 100% of the stock. Terra Nova had its office in the same space as BWP at 318 West Adams, Chicago. Lozman and Putnam testified that they would market ScanShift to traders through BWP free of charge, but money from licensing would be routed through Terra Nova.

Lozman testified that Terra Nova was created simply to allay the fear of the Townsends that partial ownership in BWP might have an adverse impact on their relationships with existing

---

[4]A patent for ScanShift was not issued until November 18, 1997. The patent was issued to BWP, and BWP still held the patent when the complaints in this case were filed.

[5]On October 28, 1994, Putnam filed with the Illinois Department of Employment Security an unemployment liability form stating that the primary business activity of BWP was in "providing securities broker-dealer services to financial institutions." Also on October 28, 1994, an Illinois business registration form was filed with the Illinois Department of Revenue to obtain a tax identification number for BWP, and it listed BWP's principal activity as a broker-dealer.

broker-dealer customers and to insulate the Townsends from any trading liability. Lozman claimed that he would not have consented to the formation of Terra Nova if he had known that he would not be a 50% owner. Lozman alleged that he, Putnam and the Townsends had an oral agreement that any proceeds from "any electronic trading, SOES trading and electronic exchanges" that were developed would be shared on "an equal basis." (Second Amend. Compl..Para. 39 (d)). The jury found that Putnam did not breach an oral agreement to deliver an ownership interest in Terra Nova to plaintiffs.

In January 1995, Lozman was in a serious bicycle accident, which led to months of painful physical therapy. At the time, he was unsure whether he could return to work. Lozman claimed that after the accident, he could not monitor defendants' activities in BWP and Terra Nova. Lozman alleged that during this time, BWP did not receive funds to which it was entitled. (Second Amend. Compl. Para. 51).

In March 1995, Lozman returned to the office, and practiced his "numchucks"[6] there to continue his physical therapy. Putnam testified that Lozman swung "numchucks" at others in the office.

On April 17, 1995, Lozman and Putnam signed a commission-splitting agreement that covered: (1) "futures and futures options commissions generated for customer accounts initiated through Scanshift or Townsend Software"; (2) "commissions paid by Townsend for the

---

[6]This term was used by the parties and by the trial court in its July 25, 2005, opinion. Lozman, Nos. 01 L 16377 & 99 CH 11347, slip op. at 20. We do not know its significance.

promotion of their software products"; and (3) "equity and equity options commissions generated from customer accounts initiated through Scanshift or Townsend Software."

Putnam testified that in June 1995, he decided to end his relationship with Lozman due to Lozman's disruptive behavior in the office and complaints received about Lozman from colleagues, vendors and customers.

Lozman alleged that in June and July 1995, Putnam and the Townsends met with another trader, Lewis Borsellino, and discussed the creation of a SOES trading organization. (Second Amend. Compl. Para. 53). Lozman alleged that this was a corporate opportunity diverted from BWP.

Lozman alleged that on June 30, 1995, he was locked out of the offices occupied by BWP and Terra Nova. Lozman sent a letter, dated July 11, 1995, to Putnam, TAL and Samuel Long[7] informing them that ScanShift could no longer be sold as an option to RealTick. Lozman alleged that from July through October 1995, defendants continued to promote ScanShift, with the Townsends' RealTick software (Second Amend. Compl. Para. 59).

Putnam and Marrgwen Townsend testified that the relationship soured between Lozman on one hand and the Townsends and Putnam on the other, when Lozman would repeatedly arrive unannounced at TAL to discuss technical bugs in the ScanShift software. Lozman would

---

[7]Samuel Long was the president of Analytic Services L.L.C., (AS), a company established by Putnam and Lozman to market and sell ScanShift to brokerage customers. Putnam and Lozman each held a 25% interest.

demand that TAL engineers fix immediately any technical bug and refused to leave the premises. Stuart and Marrgwen Townsend asked him to stop arriving unannounced.

Lozman testified that in September 1995 he attempted to find legal counsel but lacked the financial resources to pay the retainer.

The Termination

On October 9, 1995, just six months after having signed their April 17 agreement, Putnam and Lozman terminated it and ended their business relationship. In order to effect the termination, they signed a number of documents on October 9, including:

(1) three releases of liability, each signed by Lozman, Putnam and Long;

(2) a letter signed by Putnam resigning as president and board member of BWP;

(3) a "Secured Demand Note," signed by Lozman, for $15,000 to Putnam and

(4) two "Assignment[s] Separate From Certificate" signed by Putnam and transferring to Lozman 416.5 "Common A Voting Shares" of BWP and 17 "Common B Non-Voting Shares."

Lozman, Putnam and Long each signed releases that, except for the inserted names, were identically worded and only four sentences long. The release signed by Lozman stated:

"I, Fane B. Lozman, as Chairman of Blue Water Partners, Inc., hereby release Analytic Services, Terra Nova Trading L.L.C., Gerald D. Putnam and Samuel Long from any obligations past and present arising from my past association with those entities and persons and as a result of the attached agreement.

Further, I Fane B. Lozman personally release Analytic

Services, Terra Nova Trading L.L.C., Gerald D. Putnam and Samuel Long from any obligations as a result of my past association with those entities and persons and as a result of the attached agreement.

I agree to release and hold harmless Analytic Services, Terra Nova Trading L.L.C., Gerald D. Putnam and Samuel Long from any obligations resulting from the attached agreement.

I further agree not to disclose the details of this agreement or to discuss Terra Nova Trading L.L.C,. and Analytic Services or my past business relationship with Gerald D. Putnam, Samuel R. Long, Terra Nova Trading L.L.C,. and Analytic Services, with my current or future prospects or clients."

The "attached agreement" mentioned in the releases was the April 17, 1995 commission sharing agreement. The words "Void 10/9/95" were written by hand at the bottom of the April 17 agreement, followed by the signatures of both Putnam and Lozman.

Lozman testified that he believed that the October 9 release voided only the April 17 agreement, which was attached to the release. However, the trial court held that the release covered both: (1) obligations as a result of Lozman's past association with the named entities and persons; and (2) obligations as a result of the attached agreement. Lozman, Nos. 01 L 16377 & 99 CH 11347, slip op. at 16.

The release signed by Putnam was identical to the above-quoted release, except it stated

that he was president of Terra Nova Trading, L.L.C. and that he released Blue Water, Partners Inc., and Fane Lozman. The release signed by Long was also identical, except it stated that he was president of Analytic Services and the he released Blue Water Partners, Inc. and Fane Lozman.

In the resignation letter dated October 9, 1995, Putnam stated: "Dear Fane, Please accept this letter as my resignation as President and Board Member of Blue Water Partners, Inc." "Cancelled" was handwritten on Putnam's two BWP stock certificates. In a "Secured Demand Note," dated October 9, 1995, Lozman stated: "I promise to pay $15,000 to Gerald D. Putnam after profits from the sale of my invention known as 'ScanShift' exceed $100,000."

Lozman alleged that the release he signed was conditioned on Putnam and Townsends' return to him of the ScanShift software programming code, which was controlled by TAL. (Second Amend. Compl. Para. 60). At trial, Lozman and Putnam provided contradictory testimony about whether returning the ScanShift code was a condition precedent to the validity of the release. The trail court found that "[t]he only evidence that plaintiffs proffered to rebut the presumption that no conditions precedent existed was plaintiff Lozman's own testimony that the parties had agreed orally to return the ScanShift code back to Blue Water Partners." Lozman, Nos. 99 CH 11347 and 01 L 16377, slip op. at 14. The trial court held that Lozman's testimony was insufficient to rebut the presumption that a written agreement that does not state any conditions precedent, does not have any. Lozman, slip op. at 14.

Putnam testified that he believed that signing the October 9 release only obligated him to return the BWP stock certificates, though not physically returned, because they were being held

10

at the law firm of Foley & Lardner. The trial court found that, by accepting Putnam's resignation as president and director of BWP, Lozman obtained complete control over BWP and ScanShift. Lozman, slip op. at 13.

After the October 9 releases were signed, Lozman terminated all relationships with ScanShift customers by cancelling the licenses. Also, Jon Najarian became a shareholder and director of BWP.

On November 20, 1995, Lozman and Putnam signed a termination agreement that was backdated to October 9, 1995. BWP retained attorney Craig Fowler, who had been Najarian's lawyer, to draft a termination agreement to verify that Putnam had resigned his ownership in BWP. Fowler also prepared transfer documents to transfer Putnam's stock certificates on November 20, 1995. Putnam was not represented by counsel.

Although the termination agreement stated that it was "made and entered into as of the 9th day of October 1995," there is no dispute that the agreement was actually signed in November 1995. The agreement stated in part:

> "Effective immediately, the Shareholder's Agreement is hereby
> terminated and of no further force or effect; provided, however,
> that any causes of action which may have arisen thereunder prior to
> the date of this Termination Agreement, whether for or with
> respect to actions, inactions, breaches thereof or other matters,
> shall survive this termination."

The clause of the termination agreement that preserves "any causes of action" appears to

11

conflict with the October 9 release. Lozman testified that he believed that the termination agreement preserved any claims concerning the source code, electronic trading, and an electronic exchange. Putnam testified that Lozman presented the termination agreement as a clean-up document that better reflected their previous agreement under the releases and resolved problems with the transfer of shares.

Lozman alleged that Putnam and the Townsends formed Chicago Trading and Arbitrage (CTA), a SOES trading business located in the same office as BWP and Terra Nova. (Second Amend. Compl. Para. 67). Lozman alleged that CTA developed advanced software and computer mechanisms that led to the development of an electronic computer network (ECN). (Second Amend. Compl. Para. 67). Lozman alleged that CTA was using Townsend software and generating revenues to which plaintiffs claimed they were entitled based on the April 17, 1995, agreement. (Second Amend. Compl. Para. 68). Lozman alleged that this was the same line of business as that in which BWP was engaged. (Second Amend. Compl. Para. 69).

Defendant Putnam testified that in October 1996, he attended a meeting with NASDAQ representatives, whereby he realized he could build his own qualified electronic communication network (ECN).

In December 1996, the Archipelago defendants were created as a joint venture between TAL and Terra Nova, with Putnam as the Chief Executive Officer. The Archipelago defendants' business included an ECN. The Townsend defendants supplied the ECN software, and Terra Nova provided the broker-dealer services. Putnam testified that Terra Nova's brokerage license and security capital were necessary to start Archipelago's ECN, for its timely debut as allowed

under new SEC regulations. Terra Nova ceased its sponsorship of Archipelago, after Archipelago obtained its own broker-dealer license. The trial court found that Archipelago was more like a stock exchange than a broker-dealer. Lozman, Nos. 99 CH 11347 and 01 L 16377, slip op. at 9. Archipelago has since merged with the New York Stock Exchange.

Procedural History

Although the Putnam-Lozman relationship was formally dissolved on October 9, 1995, plaintiffs waited until August 9, 1999, almost four years later, to file their initial complaint. The complaint, which alleged usurpation of corporate opportunity and breach of joint venture, was later dismissed without prejudice. On December 6, 1999, plaintiffs filed a 22-count first amended complaint (No. 99 CH 11347) against Putnam, the Townsend defendants, Terra Nova Trading, L.L.C., CTA and the Archipelago defendants.

Plaintiffs alleged that misappropriated assets included: (1) BWP's leasehold interest at 318 West Adams, Chicago; (2) BWP's ScanShift computer code, programmed by the Townsends;
(2) BWP's ScanShift computer software programs, compiled by the Townsends to run on RealTick software; (4) Putnam's work time, owed to BWP; (5) a percentage share of the soft-dollar brokerage trading revenues due to BWP; (6) revenues owed to BWP from the sale of ScanShift software; and (7) corporate opportunities in the electronic trading field, SOES room trading and the electronic stock exchange.

On March 24, 2000, the trial court orally dismissed with prejudice the following counts

from the first amended complaint:  5, 6, 7, 8, 9, 10, 13, 15, 16, 17, and 21. [8] The trial court also dismissed with prejudice counts 11and 12, with respect to CTA and the Archipelago defendants only, and count 22 with respect to Terra Nova, CTA and the Archipelago defendants only.

With respect to the Archipelago defendants, the trial court dismissed with prejudice all the counts against them (which were counts 9 through 12, 17, 21 and 22) pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2000).[9]  On April 19, 2000, the trial court ordered the March 24 order amended to add  that "[t]he dismissal of the Archipelago defendants with prejudice is a final and appealable order."

On April 18, 2002, the appellate court affirmed the trial court's dismissal of counts 11, 12,  17, 21 and 22  against the Archipelago defendants.  Lozman v. Putnam, 328 Ill. App. 3d 761, 767 (2002).  However, the appellate court held that the trial court's dismissal of Counts 9 and 10 (which both alleged usurpation of corporate opportunities) was not a "final and appealable" order. Lozman , 328 Ill. App. 3d at 772.

---

[8]The numbering of the counts is the same in both the first amended and the subsequently filed, second amended complaint.

[9]The trial court dismissed counts 9 through 12, because the Archipelago defendants did not exist at the time; count 17, for lack of standing; count 21, because no independent action existed for breach of a duty of good faith and fair dealing; and count 22 for conspiracy, with respect to the Archipelago defendants, because they could not have conspired with their own agents.

The appellate court found that "the circuit court's dismissal of counts 9 and 10 involving Archipelago did not dispose of the parties' rights on a definite part of the litigation, namely, Archipelago's putative liability," because the trial court did not dismiss Count 14, which sought rescissim of Lozman's October 9 release. Lozman, 328 Ill. App. 3d at 769. The appellate court found that plaintiffs had pled sufficient facts in the complaint "to show, allegedly, the line of business from Blue Water to Archipelago, with Putnam as the fiduciary link." Lozman, 328 Ill. App. 3d at 770. Because of this link, Archipelago had potential, putative liability. Lozman, 328 Ill. App. 3d at 770. As a result, the appellate court dismissed the appeal with respect to counts 9 and 10. Lozman, 328 Ill. App. 3d at 772.

On December 28, 2000, plaintiffs filed a second amended complaint. Defendants pled affirmative defenses including release, *laches* and ratification and filed a counterclaim for declaratory relief.

On December 20, 2001, plaintiffs filed a separate action (No. 01 L 16377) against defendants GDP and Virago. On January 22, 2003, plaintiffs filed a second amended complaint in this second action which alleged three counts: (1) usurpation of corporate opportunity; (2) unjust enrichment; and (3) fraudulent conveyance of assets. The trial court dismissed count 3, and on November 1, 2004, granted summary judgment for defendant Virago on counts 1 and 2.

On March 12, 2003, plaintiffs moved the trial court for leave to file a revised, second amended complaint against the Archipelago defendants and to vacate the March 24, 2000, dismissal of counts 9 and 10 against the Archipelago defendants. On April 7, 2004, the trial court denied plaintiffs' motion. Thus, the Archipelago defendants were out of the case, prior to

15

trial.

On July 16, 2003, the trial court granted summary judgment motions: by the Townsend defendants for count 12 (joint venture), and count 19 (breach of oral contract to pay revenue and commission); and by defendants Putnam, Terra Nova and the Townsend defendants for counts 1, 3 and 11 (injunctive relief).

On November 1, 2004, the trial court granted summary judgment for defendants on count 20 (specific performance to deliver Terra Nova stock). On November 5, 2004, the trial court stated that its ruling was only with respect to specific performance, and not damages. On November 1, the trial court also granted defendant Virago's motion for summary judgment on the remaining counts against it: count 1 (corporate usurpation), and count 2 (unjust enrichment), which were from the second action. On November 3, 2004, the trial court also granted the summary judgment motion of Putnam, Terra Nova and the Townsend defendants on amended count 22 (conspiracy).

Starting on November 16, 2004, a dual bench and jury trial was held, concluding on December 16, 2004. On November 16, 2004, the trial court ruled that any jury findings concerning the equitable claims were merely advisory. The equitable claims included counts 2 and 4, for usurpation of corporate opportunities

Both the Archipelago defendants and Virago were not part of the trial.[10] As a result of

---

[10]The Archipelago defendants were not part of the trial, due to the trial court's orders on March 24, 2000 and April 7, 2004; in addition, Virago was not part of the trial due to the trial

prior dismissal and summary judgment orders, the counts at issue at trial were: counts 2 and 4, usurpation of corporate opportunity, against defendants Putnam and Terra Nova; count 14, equitable remedies of rescission, cancellation and reformation of the October 9 release; count 18, damages for breach of the April 17, 1995 agreement; count 19, damages for breach of an alleged oral contract by defendants Putnam and Terra Nova to pay BWP "revenues and brokerage commissions" due under a "soft-dollar brokerage trading agreement"; and count 20, damages, against defendants Putnam and Terra Nova, resulting from Putnam's alleged promise to Lozman to deliver a 50% ownership interest in Terra Nova. In addition, there were also counts against defendant GDP from the second action (No. 01 L 16377) for usurpation of corporate opportunity and unjust enrichment.

The jury found for plaintiff BWP on its claim of usurpation of corporate opportunities, against Putnam and Terra Nova (counts 2 and 4). The jury found for defendants Putnam and Terra Nova: on count 18, plaintiffs' claim for breach of the written April 17, 1995 contract; and on count 19, plaintiffs' claim for breach of an alleged oral contract. The jury also found for defendant GDP on count 1 (usurpation of corporate opportunities) of the second action.

In addition, the jury answered 12 special interrogatories. In the interrogatories, the jury found that: a broker-dealer business was reasonably incident to the present or prospective business of BWP; Putnam breached his fiduciary duty to BWP by usurping business from BWP and pursuing that business with Terra Nova; Putnam failed to disclose to BWP the corporate

court's order on November 1, 2004.

opportunities of a broker-dealer business, a SOES room, an ECN and an electronic exchange; and Putnam did <u>not</u> promise Lozman a 50% interest in Terra Nova.

With respect to the October 9, 1995 release, the jury found that: it was <u>not</u> signed on the condition that Putnam would furnish Lozman the ScanShift source code; it was just and equitable to Lozman and BWP; it was <u>not</u> obtained by Putnam without disclosure of material facts; it was supported by consideration; the scope of the release was <u>not</u> limited to releasing the April 17, 1995, agreement; and plaintiffs ratified the release.

The jury also found, without regard to the validity of the release, that: defendants did <u>not</u> breach the written April 17, 1995 contract; there was no oral contract to give Lozman 50% ownership of Terra Nova; and the value of Terra Nova was $2,500,000.

On July 25, 2005, the trial court entered judgment for defendants Putnam, Terra Nova and GDP on Counts 2, 4, 18, 19 and 20; on all claims against GDP; and on the counterclaim for declaratory judgment. The trial court concluded that the October 9 release was valid; that plaintiffs ratified the release; and that the doctrine of *laches* barred plaintiffs' claims of corporate usurpation (counts 2 and 4 from the first action; and count 1 from the second action).

On August 23, 2005, the trial court entered an order modifying its July 25 opinion to add judgment for defendants on Count 14 (rescission, cancellation and reformation of the October 9 release). On March 14, 2006, the trial court denied plaintiff's posttrial motion.

On March 31, 2006, plaintiffs filed a notice of appeal appealing a list of over 20 orders. In their appellate brief, plaintiff asked this court to reverse only six orders:

(1) July 24, 2005 order and opinion, entered after the dual bench and jury trial;

18

(2) August 23, 2005 order, amending the July 24 order to include dismissal of count 14;

(3) March 14, 2006 order, denying plaintiffs' posttrial motion;

(4) November 3, 2006 order granting the Townsend defendants' motion for summary judgment on amended count 22;

(5) March 24, 2000, order dismissing the Archipelago defendants pursuant to section 2-615, affirmed in part by this court, with the appeal dismissed with respect to counts 9 and 10; and

(6) April 7, 2004, order of the circuit court, on remand, denying plaintiffs' motion to vacate the March 24 dismissal of counts 9 and 10 against the Archipelago defendants and denying plaintiffs' motion to file additional counts against the Archipelago defendants. Alternatively, plaintiffs seek a new trial "as to all defendants originally named in this action."

This case has been appealed a total of three times. First, on January 22, 2000, this court affirmed the trial court's denial of plaintiffs' motion for a temporary restraining order. Second, on April 18, 2002, this court issued an opinion affirming in part the trial court's dismissal pursuant to section 2-615. The third time is the instant appeal. For the reasons discussed below, this court affirms.

ANALYSIS

In their appellate brief to this court, plaintiffs make four claims: (1) the trial court erred on July 25, 2005, when it held after the trial that the October 9 release and the equitable doctrine

of *laches* precluded plaintiffs' recovery[11] on counts 2 and 4;[12] (2) the trial court erred on March 24, 2000 when it dismissed the Archipelago defendants under section 2-615;[13] (3) the trial court erred on July 25, 2005 when it held that defendant GDP was covered by the October 9 release; and (4) the trial court erred on November 3, 2004 when it granted the Townsend defendants' motion for summary judgment on amended count 22.

Standards of Review

Plaintiffs appeal the trial court's judgment after a dual bench and jury trial, as well as orders by the trial court granting motions to dismiss pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2000)) and motions for summary judgment (735 ILCS

---

[11]The trial court found that the October 9 release precluded plaintiffs' recovery on counts 2 and 4, for usurpation of corporate opportunities. Lozman, Nos. 01 L 16377 and 99 CH 11347, slip op. at 10. Count 14 sought rescission, cancellation and reformation of the October 9 release.

[12]Plaintiffs' appellate brief makes no arguments with respect to the other counts decided against plaintiffs after trial: count 18 (breach of written April 17, 1995 agreement), count 19 (breach of alleged oral contract to pay "soft-dollar" revenues to BWP) and count 20 (breach of an alleged promise to deliver 50% ownership interest in Terra Nova to Lozman). In essence, plaintiffs' appellate briefs decided to drop the legal counts and proceed only on the equitable counts.

[13]As explained below, only counts 9 and 10 (usurpation of corporate opportunity) are properly before this court.

5/2-1005 (West 2000)).

For factual findings made by a trial court during a bench trial, we apply a "manifest weight of the evidence" standard. Eychaner v. Gross, 202 Ill. 2d 228, 251 (2002). We apply the same standard for a jury verdict. Hanumadass v. Coffield, Ungaretti & Harris, 311 Ill. App. 3d 94, 102 (1999). A finding is against the manifest weight of the evidence "only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." Eychaner, 202 Ill. 2d at 252.

This court will also apply a de novo standard of review to grants of motions to dismiss under section 2-615 (735 ILCS 5/2-615) (West 2000)) and motions for summary judgment (735 ILCS 5/2-1005 (West 2000). Iseberg v. Gross, 366 Ill. App. 3d 857, 860 (2006) (dismissal under section 2-615); Ragan v. Columbia Mutual Insurance Co., 183 Ill. 2d 342, 349 (1998) (summary judgment).

With respect to summary judgment, our supreme court has held that it "is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions and admissions on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Ragan, 183 Ill. 2d at 349.

By contrast, a motion to dismiss under section 2-615 is a challenge to the legal sufficiency of the complaint. Iseberg, 366 Ill. App. 3d at 860. In reviewing the legal sufficiency of the complaint, we regard all well-pled facts as true and draw all reasonable inference in favor of the plaintiff. Iseberg, 366 Ill. App. 3d at 860. We construe the complaint liberally and dismiss only when it appears that plaintiffs could not recover under any set of facts. Iseberg, 366

No. 1- 06-0861

Ill. App. 3d at 861.

## I. Laches

Plaintiffs claim that the October 9 release did not preclude their recovery on counts 2 and 4 for usurpation of corporate opportunities, because: (1) the release was invalid due to defendants' breach of fiduciary duty and failure to disclose material facts; (2) plaintiffs were entitled to the remedy of rescission (3) plaintiffs were also entitled to the remedy of cancellation; (4) plaintiffs did not ratify the release, as the trial court found; (5) even if the release was valid, its scope did not include plaintiffs' claims of breach of fiduciary duty and corporate usurpation; and (6) Putnam's failure to disclose material facts precluded the trial court's finding of *laches*.

For the reasons discussed below, this court rejects plaintiffs' *laches* arguments. Since we affirm the trial court's *laches* finding, we do not need to consider plaintiffs' first five arguments. Plaintiffs' first five arguments all relate to the release: its validity, rescission, cancellation, ratification and scope. However, the trial court's decision rested on two independent grounds: the release; and the equitable doctrine of *laches*. Since we accept the latter, we do not need to consider the former. [14]

_____

[14]In addition, rescission and cancellation (count 14) are equitable remedies, to which the equitable defense of *laches* also applied. Adams v. Greg Weeks, Inc., 327 Ill. App. 3d 380, 384 (2002) (rescission and cancellation are equitable remedies); Wilkonson v. Yovetich, 249 Ill. App. 3d 439, 446 (1993) (rescission is an equitable remedy); Hannigan v. Hoffmeister, 240 Ill. App. 3d 1065, 1074 (1992) (*laches* is an equitable defense); John J. Calnan Co. v. Talsma Builders,

22

Plaintiffs claim that the trial court erred on July 25, 2005 when it found that *laches* barred plaintiffs' recovery on counts 2 and 4 (usurpation of corporate opportunities). Lozman, Nos. 01 L 16377 and 99 CH 11347, slip op. at 10. Usurpation of a corporate opportunity is a claim based in equity and thus subject to the equitable defense of *laches*. Tarin v. Pellonari, 253 Ill. App. 3d 542, 550-51 (1993) (*laches* applied to claim of misappropriation of corporate opportunities).

Plaintiffs claim error, because: (1) since Putnam, as a fiduciary, had a duty to disclose certain facts and failed to do so, the "running of time" for *laches* began on the date that plaintiffs actually discovered his fraud; (2) *laches* may not be used as an affirmative defense in those limited circumstances where a fiduciary knowingly violated a restriction and pressed ahead; (3) *laches* cannot be found where the statute of limitations has not run; and (4) in the alternative, plaintiffs claim that they were diligent, and any finding to the contrary was against the manifest weight of the evidence. For the reasons stated below, we do not find plaintiffs' arguments persuasive.

In order to prevail on the affirmative defense of *laches*, defendants must prove: (1) that there was "a lack of due diligence" by plaintiffs in bringing suit; and (2) plaintiffs' delay resulted in "prejudice" to defendants. People v. McClure, 218 Ill. 2d 375, 389 (2006); Jameson Realty Group v. Kostiner, 351 Ill. App. 3d 416, 431-32 (2004); People v. Hawkins, 181 Ill. 2d 41, 54 (1998).

For the first requirement, plaintiffs "must have failed to seek prompt redress after having

_____

Inc., 67 Ill. 2d 213, 220 (1977) (cancellation is an equitable remedy).

23

knowledge of the facts upon which [their] claim is based." Eckberg v. Benso, 182 Ill. App. 3d 126, 132 (1989). Plaintiff "need not have actual knowledge of the specific facts upon which his claim is based if he fails to ascertain the truth through readily available channels and the circumstances are such that a reasonable person would make inquiry concerning these facts." Eckberg, 182 Ill. App. 3d at 132.

The determination of whether *laches* applies to a particular set of facts is left to the sound discretion of the trial judge. Hannigan, 240 Ill. App. 3d at 1074;. Tarin, 253 Ill. App. 3d at 550; Pettey v. First National Bank, 225 Ill. App. 3d 539, 545-46 (1992); Eckberg, 182 Ill. App. 3d at 131. An appellate court will not disturb a trial court's determination of *laches* "unless that determination is so clearly wrong as to constitute an abuse of discretion." Hannigan, 240 Ill. App. 3d at 1074; Tarin, 253 Ill. App. 3d at 550. An abuse of discretion occurs when the trial court's judgment was "palpably erroneous, contrary to the manifest weight of the evidence, or manifestly unjust." O'Brien v. Meyer, 281 Ill. App. 3d 832, 835 (1996). The burden of pleading and proving the defense is on the movant. Hannigan, 240 Ill. App. 3d at 1074.

The trial court found both *laches* requirements satisfied because: (1) plaintiffs did not exhibit due diligence in pursuing their claims, when they knew at the time of the release signing that Putnam intended to continue operating Terra Nova as a broker-dealer business reasonably incident to BWP's business; and (2) defendants would be prejudiced, since they relied on the release in pursuing their own businesses. Lozman, Nos. 01 L 16377 and 99 CH 11347, slip op. at 26-27.

On appeal, plaintiffs claim that different *laches* rules apply in the fiduciary context.

24

First, plaintiffs claim that where a defendant fiduciary had a duty to disclose facts and failed to do so, then the "running of time" for *laches* began on the date that plaintiffs actually discovered defendant's fraud. Prueter v. Bork, 105 Ill. App. 3d 1003, 1007 (1981). Prueter, cited and quoted by plaintiff, states:

> "Although the period of time on which *laches* is predicated
> normally begins to run either when the plaintiff learns of the facts
> on which his rights are based or when a reasonable person would
> acquire such knowledge, a different rule applies where a fiduciary
> relationship is involved. Where a fiduciary has a duty to disclose
> certain facts to the plaintiff but fraudulently fails to do so,
> plaintiff's failure to ascertain these facts is excused. In such cases,
> the running of time begins when the fraud is actually discovered by
> plaintiff." (Citations omitted) Prueter, 105 Ill. App. 3d at 1007.

However, plaintiffs' brief failed to specify the facts that defendant failed to disclose, with the dates when plaintiff actually discovered those facts. 210 Ill. 2d R. 341 (h)(7) ("Argument" section of appellant's brief "shall contain" citation to "the pages of the record relied on"). Since plaintiffs have failed to even allege – let alone prove – the dates of their discovery, facts uniquely within their possession, plaintiffs have failed to explain how the trial court abused its discretion in computing the time when *laches* should have begun to run.

Second, plaintiffs claim that *laches* may not be used an as an affirmative defense in those limited circumstances where "a fiduciary knowingly violated a restriction *** and pressed

ahead." For support, plaintiff cited a 1929 case: FICA v. Burnham, 251 Ill. App. 333 (1929).

FICA is not on point. The opinion never even discusses fiduciary duty. After citing FICA,

plaintiffs also cited Pettey, 225 Ill. App. 3d (without a page cite) which also does not discuss

fiduciary duty. Even if FICA and Pettey were somehow relevant, this section of plaintiffs' brief

does not discuss facts or contain any citations to the record, as required by Supreme Court Rule

341(h)(7). 210 Ill. 2d R. 341(h)(7) ("Argument" section of appellant's brief "shall contain"

citation to "the pages of the record relied on"). Plaintiff's failure to provide evidentiary support

waived any possible way this court could entertain their argument.

Third, plaintiffs claim that *laches* cannot be found before the five-year statute of

limitations ran, and cited for support Pinelli v. Alpine Development Corp., 70 Ill. App. 3d 980,

1004 (1979). Pinelli states: "*laches* will not be found if the delay is short of the statutory period

of limitations and there has been no change of circumstances." (Emphasis added.) Pinelli, 70

Ill. App. 3d at 1004. Plaintiffs do not even try to argue that there had been no change of

circumstances, between the formal dissolution of the Putnam-Lozman business relationship on

October 9, 1995, and plaintiffs' filing of their first complaint on August 9, 1999, almost four

years later. As Pinelli states, "[a] party seeking to rescind a contract on grounds of fraud or

misrepresentation must elect to do so promptly after learning of the fraud or misrepresentation."

(Emphasis added.) Pinelli, 70 Ill. App. 3d at 1004. Pinelli does not help plaintiffs.

Last and least, plaintiffs argue in the alternative "that they were diligent, and any finding

to the contrary was against the manifest weight of the evidence." Plaintiffs make this claim in

one line without any factual support or legal argument. This court has repeatedly held that a

party waives a point by failing to argue it.  Roiser v. Cascade Mountain, Inc., 367 Ill. App. 3d 559, 568 (2006) (by failing to offer supporting legal authority or "any reasoned argument," plaintiffs waived consideration of their theory for asserting personal jurisdiction over defendants);  People v. Ward, 215 Ill. 2d 317, 332 (2005) ("point raised in a brief but not supported by citation to relevant authority *** is therefore forfeited"); In re Marriage of Bates, 212 Ill. 2d 489, 517 (2004) ("A reviewing court is entitled to have issues clearly defined with relevant authority cited"); Ferguson v. Bill Berger, Associates, Inc., 302 Ill. App. 3d 61, 78 (1998) ("it is not necessary to decide this question since the defendant has waived the issue" by failing to offer case citation or other support as Supreme Court Rule 341 requires); 210 Ill. 2d R. 341(h)(7) (argument in appellate brief must be supported by citation to legal authority and factual record).

For the foregoing reasons, we do not find plaintiffs' *laches* arguments persuasive.

## II. Dismissal of Archipelago Defendants

Plaintiffs already appealed, and this court already affirmed, the section 2-615 dismissal of most of the counts against the Archipelago defendants.  Lozman, 328 Ill. App. 3d at 772. This court dismissed the prior appeal only with respect to counts 9 and 10.  Lozman, 328 Ill. App. 3d at 772.  Thus, only the trial court's section 2-615 dismissal of counts 9 and 10 is before this court at this time.  In re Christopher K., 217 Ill. 2d 348, 363 (2005) ("The law-of-the-case doctrine prohibits the reconsideration of issues that have been decided by a reviewing court in a prior appeal"); Norton v. City of Chicago, 293 Ill. App. 3d 620, 624 (1997) ("A question of law decided on appeal is binding on the trial court on remand and the appellate court if the case is

appealed again").

Count 9 sought injunctive relief for usurpation of corporate opportunity. Lozman, 328 Ill. App. 3d at 765. Count 10 sought an accounting, constructive trust and monetary relief for usurpation of corporate opportunity. Lozman, 328 Ill. App. 3d at 765.[15] "Archipelago's putative liability" was through Putnam who was "the fiduciary link" in "the line of business from Blue Water to Archipelago." Lozman, 328 Ill. App. 3d at 769-70.

As we held above, the affirmative defense of *laches* barred recovery on plaintiffs' claims for usurpation of corporate opportunity. Great West Casualty Co. v. Cote, 365 Ill. App. 3d 100, 105 (2006) (an appellate court can affirm the trial court's dismissal on any ground warranted by the record, even if it was not the reason given for the dismissal), citing Beckman v. Freeman United Coal Mining Co., 123 Ill. 2d 281, 286 (1988). Thus, plaintiffs cannot succeed on their remaining counts 9 and 10 against the Archipelago defendants.

### III. Defendant GDP

In its brief to this court, plaintiffs claim that the trial court should have entered judgment against defendant GDP. The counts against GDP that went to trial were count 1 (usurpation of

---

[15]With respect to counts 9 and 10, this court previously held: "the circuit court's dismissal of counts 9 and 10 involving Archipelago did not disposed of the parties' rights on a definite part of the litigation, namely, Archipelago's putative liability, because count 14, the pending rescission count, was not dismissed." Lozman, 328 Ill. App. 3d at 769. Count 14 sought rescission of the October 9, release. Lozman, 328 Ill. App. 3d at 765.

corporate opportunities) and count 2 (unjust enrichment). In its July 25, 2005 opinion, the trial court found that: (1) GDP should be held liable for any corporate opportunities that Putnam and Terra Nova were held liable for usurping; and (2) GDP would be unjustly enriched if it were allowed to keep any monetary distributions resulting from its imputed liability. Lozman, Nos. 01L 16377 and 99 CH 11347, slip op. at 7-8. However, the trial court also found that both the October 9 release and the doctrine of *laches* barred any finding of damages for plaintiffs. Lozman, Nos. 01L 16377 and 99 CH 11347, slip op. at 10 and 27.

In their appellate brief, plaintiffs abandoned their claims against GDP by failing to provide any facts or legal reasoning. Plaintiffs' brief mentioned GDP twice: (1) in the jurisdictional statement, which stated that the jury returned an advisory verdict in favor of GDP; and (2) in the four-sentence section of its argument relating to GDP. GDP is not mentioned once in the statement of facts. Plaintiffs do not identify defendant GDP; they do not explain what role GDP played in the events; and they do not specify the corporate opportunities that were allegedly transferred to GDP.

The four-sentence argument section concerning GDP contains no facts and lists what are, in essence, argument headings:

> "GDP was not covered by the Release. Plaintiffs are entitled to judgment against GDP [record cite omitted]. The usurped corporate opportunities were in part transferred to GDP. The tracing authorities cited above [in a prior section] also support liability against GDP [two case citations, omitted]."

The trial court agreed with most of the assertions in the above paragraph. The trial court

29

did find that the opportunities were transferred, in part, to GDP, and that liability could be traced in part to GDP. The place where the trial court and plaintiffs differ is that the trial court found that both the October 9 release and the doctrine of *laches* barred recovery. In the above paragraph, plaintiffs claim that "GDP was not covered by the Release" but without offering any supporting facts or legal analysis.

The brief filed on behalf of defendant GDP noted that plaintiffs' brief waived any arguments concerning defendant GDP by failing to supply facts and legal reasoning. Instead of replying, plaintiffs' reply brief dropped their GDP claims entirely.

As already noted above, a party waives a point by failing to argue it. Roiser v. Cascade Mountain, Inc., 367 Ill. App. 3d 559, 568 (2006) (by failing to offer supporting legal authority or "any reasoned argument," plaintiffs waived consideration of their theory for asserting personal jurisdiction over defendants); People v. Ward, 215 Ill. 2d 317, 332 (2005) ("point raised in a brief but not supported by citation to relevant authority *** is therefore forfeited"); In re Marriage of Bates, 212 Ill. 2d 489, 517 (2004) ("A reviewing court is entitled to have issues clearly defined with relevant authority cited."); Ferguson v. Bill Berger Associates, Inc., 302 Ill. App. 3d 61 (1998) ("it is not necessary to decide this question since the defendant has waived the issue" by failing to offer case citation or other support as Supreme Court Rule 341 requires); 210 Ill. 2d R. 341(h)(7) (argument in appellate brief must be supported by citation to legal authority and factual record).

IV. Amended Count 22 Against Townsend Defendants

On appeal, plaintiffs claim that the trial court erred on November 3, 2004, when it granted

summary judgment for the Townsend defendants on amended count 22 (conspiracy).  Lozman v. Putnam, No. 99 CH 11347, slip op. at 4 (Nov. 3, 2004).

"Civil conspiracy is defined as 'a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means.' " McClure v. Owen Corning Fiberglass, Corp., 188 Ill. 2d 102, 133 (1999), quoting Buckner v. Atlantic Plant Maintenance, Inc., 182 Ill. 2d 12, 23 (1998).  To state a claim for civil conspiracy, a plaintiff must allege both: (1) an agreement; and (2) a tortious act committed in furtherance of that agreement.  McClure, 188 Ill. 2d at 133.  A defendant is liable as a conspirator if he or she " 'understands the general objectives of the conspiratorial scheme, accepts them, and agrees, either explicitly or implicitly  to do [his or her] part to further those objectives.' " McClure, 188 Ill. 2d at 133, quoting Adcock v. Brakegate, Ltd., 164 Ill. 2d 54, 64 (1994)

Plaintiffs argued to the trial court that an agreement existed between Putnam and the Townsend defendants and that they committed "a tortious act" in furtherance of that agreement. Lozman , No. 99 CH 11347, slip op. at 2.   Specifically, plaintiffs claimed to the trial court, first, that the "Townsends falsely represented to Plaintiff Lozman that they did not wish to become involved as owners in a broker/dealer business for fear of unwarranted liability."  Lozman , No. 99 CH 11347, slip op. at 2.  Based on this allegedly false representation, Putnam and the Townsends convinced plaintiffs to form a new company, which was Terra Nova. Lozman , No. 99 CH 11347, slip op. at 2.  Lozman claimed that he would not have agreed to the formation of Terra Nova if he knew that the Townsends had lied.  Lozman , No. 99 CH 11347, slip op. at 2. Plaintiffs claimed that the Townsends' subsequent willingness to become owners of Archipelago,

which was also a broker-dealer business, showed that the Townsends' alleged fear was false. Lozman , No. 99 CH 11347, slip op. at 2.

Second, plaintiffs claimed to the trial court that the Townsends were "involved in concerted action" with Putnam on June 30, 1995, when, on the same day, Putnam locked Lozman out of the offices shared by BWP and Terra Nova, and Marrgwen Townsend told Lozman that she would not give him permission to sell the Townsend version of ScanShift. Lozman , No. 99 CH 11347, slip op. at 2-3. In addition, plaintiffs claimed that Stuart Townsend falsely informed Lozman that the ScanShift source code had been destroyed. Lozman , No. 99 CH 11347, slip op. at 3.

Before the trial court, the parties disputed what was the correct standard of proof. Plaintiffs claimed that the correct standard was the normal standard on a summary judgment motion, namely, whether there is a triable issue of fact. Lozman , No. 99 CH 11347, slip op. at 2. That standard is noted above, in the standard of review section of this opinion. However, defendants claimed that the correct standard was "clear and convincing" evidence. Lozman , No. 99 CH 11347, slip op. at 2. Because plaintiffs relied on circumstantial evidence, defendants asserted that the "clear and convincing" standard was required by McClure, 188 Ill. 2d at 134 and Ray Dancer, Inc. v. D M C Corp., 230 Ill. App. 3d 40, 50 (1992). In response, plaintiffs argued to the trial court that an unreported, federal district court case showed that the "clear and convincing" standard was not required. Lozman , No. 99 CH 11347, slip op. at 2, citing State Farm Mutual Automobile Co. v. Abrams, No. 96 C 6365 (Ill. May 11, 2000), (cited to the trial court by plaintiffs).

The trial court correctly noted that the federal district court case carried no precedential value, and instead applied the "clear and convincing" standard required by our supreme court in McClure. Lozman , No. 99 CH 11347, slip op. at 4. In McClure, our supreme court held that: "If a civil conspiracy is shown by circumstantial evidence, however, the evidence must be clear and convincing." McClure, 188 Ill. 2d at 134. If the facts are as consistent with innocent conduct as they are with guilty conduct, then the evidence is neither clear nor convincing. McClure, 188 Ill. 2d at 140-41. If a party relies solely on circumstantial evidence to prove a conspiracy claim, the heightened "clear and convincing" standard is implicated by the summary judgment motion. Ray Dancer, 230 Ill. App. 3d at 50. To determine whether a genuine issue of fact exists, the trial court must consider the "clear and convincing" standard of proof. Ray Dancer, 230 Ill. App. 3d at 50.

The trial court stated that if the "ordinary" standard for a summary judgment motion had applied, it would not have granted the motion. Lozman , No. 99 CH 11347, slip op. at 4. In support of this conclusion, the trial court noted "[i]n particular" that defendants did not dispute plaintiffs' assertion that Stuart Townsend had lied to Lozman about the destruction of the ScanShift source code. Lozman , No. 99 CH 11347, slip op. at 4. The trial court stated that it granted the summary judgment motion only because the heightened "clear and convincing" standard was required on this summary judgment motion. Lozman , No. 99 CH 11347, slip op. at 4.

On appeal, plaintiffs do not contest the "clear and convincing" standard . Thus, the standard of proof is not an issue before this court. Also, plaintiffs do not dispute the fact that

33

their proof consisted of circumstantial evidence, thus triggering the heightened standard.

Instead, on appeal, plaintiffs raise a claim that they did not raise before the trial court, namely that the trial court was mistaken when it stated that plaintiffs were required to show a tortious act. Lozman , No. 99 CH 11347, slip op. at 3, quoting McClure, 188 Ill. 2d at 133. On appeal, plaintiffs claim that Putnam's breach of fiduciary duty was "unlawful" and that a civil conspiracy claim may be based on either a tortious or unlawful act.

In their brief to the trial court in opposition to the summary judgment motion, plaintiffs stated repeatedly that proof of a conspiracy required proof of an agreement and at least one tortious act in furtherance of the conspiracy. The brief spent many pages detailing the tortious acts committed by defendants.

The Illinois Supreme Court has held, under " 'the doctrine of invited error,' " that a party " 'may not request to proceed in one manner and then later contend on appeal that the course of action was in error.' " People v. Harvey, 211 Ill. 2d 368, 385 (2004) quoting People v. Carter, 208 Ill. 2d 309, 319 (2003). To permit a party to use, as a vehicle for reversal, the exact action which it procured in the trial court " 'would offend all notions of fair play' " and encourage duplicity by litigants. Harvey, 211 Ill. 2d at 385 quoting People v. Villarreal, 198 Ill. 2d 209, 227 (2001). Thus, plaintiffs cannot raise on appeal the question of whether they could show an unlawful, as opposed to a tortious, act in furtherance of the conspiracy.[16]

Even if this court permitted plaintiffs to raise this issue for the first time on appeal,

---

[16]Plaintiffs' "unlawful" claim was not raised in their posttrial motion either.

plaintiffs' appellate brief does not identify the allegedly unlawful, as opposed to tortious, acts which they failed to bring to the attention of the trial court.

For the foregoing reasons, we do not find plaintiffs' argument persuasive, and thus affirm the trial court's November 3, 2004, order granting the Townsend defendants' motion for summary judgment on count 22.

CONCLUSION

For the foregoing reasons, we affirm the order and opinion of the trial court.

Affirmed.

WOLFSON and GARCIA, JJ., concur.